(No. 68474.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DAVID SMITH, Appellant.

*Opinion filed October 15, 1992.—Rehearing denied November 30, 1992.*

Randolph N. Stone and Rita A. Fry, Public Defenders, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Sally L. Dilgart, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

David Smith (defendant) was charged in connection with the March 17, 1987, stabbing death of Lisa Ferguson (victim) in Chicago. After the prosecutor nol-prossed other counts of the indictment, defendant proceeded to a jury trial in the Cook County circuit court on the following charges: two counts of murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)); two counts of felony murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1 (a)(3) (with aggravated criminal sexual assault and home invasion as predicate felonies)); one count of home invasion (Ill. Rev. Stat. 1987, ch. 38, par. 12—11(a)(2)); and two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(2)). Defendant was convicted of murder, aggravated criminal sexual assault and home invasion. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty and sentenced him to death. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g).) Defendant's death sentence was stayed pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a)).

## BACKGROUND

The evidence showed that sometime in early March of 1987, the victim quarreled with her boyfriend, Anthony Ramirez. Shortly thereafter she moved in with her aunt,

Juanita Soto, in Juanita's rear apartment. Also living at the apartment were Juanita's boyfriend, Carlos Moya, their four-year-old child, Sirena Moya, and a friend named Edward Ramirez who needed a temporary place to stay. On the night of the murder, Lisa agreed to baby-sit for Sirena while the others celebrated at a local bar three to four blocks from the apartment.

Juanita met Carlos at the bar late in the afternoon, and defendant arrived with his friends Edward and Efraim Ramirez around 6 p.m. Juanita and Carlos chatted with defendant for awhile. Juanita had known defendant for 13 or 14 years and considered him to be a good friend; defendant visited Carlos and Juanita often to eat meals or to spend the night. Carlos in turn had known defendant for 12 years. The victim's brother, Max Ferguson, was also at the bar, and Max grew up in defendant's neighborhood.

Defendant left the bar alone around 7:30 p.m.

Max and Edward Ramirez left around 8:15 p.m. to visit the victim, but they soon came running back into the bar "huffing and puffing." Juanita, Edward, and Carlos ran to the apartment, where they were met by Chicago police officers.

At 7:45 p.m. that night Sharon Chandler, who lived in the front apartment, heard someone in the rear apartment yelling and screaming. Sharon heard a woman ask, "What do you want, leave me alone," and a man say, "Shut up, be quiet." Sharon also heard a noise similar to that of furniture being moved and some "slapping sounds, someone hitting someone else." Sharon knocked on Lisa's door and asked the occupants of the apartment to be quiet. While calling the police department to report a fight, Sharon heard the woman yell, "Help me! Help me!" Then there was a long scream followed by complete silence. Police officers arrived 5 to 10 minutes later.

Officer Sharon Gaynor responded to a radio call of a fight in progress in the rear apartment at 8:15 p.m. Upon arriving at the scene, Gaynor found the back door of the rear apartment open. Entering the apartment, she found the victim's body lying face down in a pool of blood. The victim was naked from the waist down, and her jeans and panties had been pulled down and caught near her right ankle. Her shirt had been pulled up above her waist. Officers found two knives with bent blades under and next to the body as well as a curling iron under the victim's left leg and near her buttocks.

As Officer Gaynor inspected the victim's body, she heard a noise in another room and discovered four-year-old Sirena Moya "huddled in the corner of the bedroom with a blanket pulled over her head." During a conversation between them, Sirena said a man named "David," her father's friend, had been in the apartment that evening. Gaynor found an address book in the apartment that contained the name "David Smith" and called the number, only to find that it had been disconnected.

Juanita Soto gave police officers a description of the clothing worn by defendant in the bar that evening and directed Officers Simon and Lukensmeyer to defendant's nearby apartment. Juanita and Max Ferguson also directed officers to Anthony Ramirez's home where Ramirez, the victim's boyfriend, was taken into custody.

As Simon and Lukensmeyer stood in the gangway outside defendant's apartment building at approximately 10 p.m., they could hear a man and woman arguing. Standing in the hallway the officers heard defendant say, "I saw somebody get killed tonight," followed by the statement, "I did it." After the officers knocked on the door and defendant identified himself, defendant was taken into custody. Testimony indicated that defendant had changed his clothes after leaving the bar, and also that his hair was wet when arrested.

After Josephine Palomino told officers that they could "look around" the apartment she shared with defendant, Officer Lukensmeyer found a pair of jeans and some thermal underwear in a laundry wash basin in the apartment. The clothing was wet. Palomino later signed a written consent to search which the officers relied on in returning to defendant's apartment to recover a pair of shoes. The jeans, thermal shirt and shoes were identified as clothing worn by defendant in the bar that evening, and there was human blood on the thermal underwear and shoes. No blood was found on defendant's jeans.

No latent fingerprints were found on the knives discovered near the victim's body. Latent prints found at various locations inside the apartment belonged to the victim or could not be identified. Vaginal, oral and rectal swabs taken from the victim tested negative for the presence of semen and spermatozoa. The victim and defendant shared the same blood type.

After receiving *Miranda* warnings, and having been told there was blood found on his clothing, defendant gave oral statements at approximately 10:30 p.m. In a written summary of these statements taken at 1:20 a.m. by Edward Edens, an assistant State's Attorney, defendant admitted killing Lisa Ferguson. According to this summary which defendant signed, defendant had known Lisa Ferguson for several years but he did not know that she was still in the neighborhood. He admitted going to the apartment that evening to steal a VCR. When Lisa answered the door, he asked if "Boo Boo" Ramirez was home, received a negative answer, and left. Defendant then walked around for a while and then returned. The summary taken by Edens states that "he didn't know why he went back up to the apartment except that he must have intended to kill her." Defendant then forced his way into the apartment and stabbed Lisa with

a knife he found in the kitchen. The statement indicates that cuts found on defendant's body were not received during the murder but were from an injury defendant had received at work the day before. The statement indicates that "he was glad that she died because he wouldn't want her to remember how badly he had beaten her."

At one point while being interrogated, officers asked defendant to remove his pants. A large stain on defendant's knee contained human blood. Officers testified that they denied defendant's request to use the restroom after noticing the blood because they feared he would attempt to destroy evidence. Forensic experts later found human blood on the inside panel of defendant's underpants. The officers also noticed a fresh cut covered by a bandage on defendant's thumb and photographed abrasions on defendant's wrists.

Anthony Ramirez was also interrogated by police. Officer McCann testified that he inspected Ramirez for bloodstains and asked him to drop his pants to see if there was blood on his body. No blood was found. Later, Ramirez and defendant were placed in a lineup with two fillers and Sirena Moya identified defendant. (This identification was not used by the State at defendant's trial, however.) Ramirez was later released without being charged.

Following trial, the jury found defendant guilty of murder, home invasion, and aggravated criminal sexual assault. The jury also found defendant eligible for the death penalty under the statutory aggravating factor of murder in the course of the felony of home invasion or aggravated criminal sexual assault. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6).) After the same jury concluded that there were no mitigating factors sufficient to preclude the death penalty, and defendant declined to give a statement in allocution, the judge sentenced defendant

to death for the murder of Lisa Ferguson and ordered penitentiary terms for the remaining felonies.

We address the issues raised by defendant *seriatim.*

## I

Defendant argues that the officers violated the fourth amendment and article I, section 6, of the Illinois Constitution when they listened to a conversation from outside his apartment door. Because police conduct violated these constitutional rights, he argues, his statements admitting involvement in a murder that evening should have been suppressed.

Testimony at both trial and at defendant's suppression hearing detailed the circumstances immediately prior to defendant's arrest. After police officers talked to Sirena Moya and the victim's relatives, Officers Simon and Lukensmeyer drove to defendant's home. Walking through a gangway next to defendant's apartment building, the officers heard a man and woman arguing in the basement apartment. The officers went to the back of the building, opened the unlocked back door, walked down a few steps into the building and entered a common-area hallway. The door of defendant's basement apartment was five to six feet from the back door. While standing in the hallway, Officer Simon testified, he heard the following conversation between a woman and man. The man's voice was later identified as belonging to defendant:

> "Female voice: 'Where have you been tonight?'
>
> Defendant: 'I have been out.'
>
> Female voice: 'Where have you been tonight?'
>
> Defendant: 'I saw somebody get killed tonight.'
>
> Female voice: 'Your clothes are all full of blood. You had something to do with it.'
>
> Defendant: 'I did it.' "

The officers then knocked on the door, announced that they were police and asked the man inside to open the door. Defendant opened the door, identified himself, and the officers arrested him. Defendant challenges the trial court's decision to allow one of the officers to testify regarding that portion of the conversation spoken by defendant under the admission exception to the hearsay rule. The trial court suppressed those statements made by the female voice.

The fourth amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (U.S. Const., amend. IV.) The Illinois Constitution similarly protects the right of the people "to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means." (Ill. Const. 1970, art. I, §6.) We believe that neither protection was violated in this case.

The starting point for fourth amendment search and seizure analysis is *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507. In *Katz*, the United States Supreme Court established the principle that the "Fourth Amendment protects people, not places." Justice Harlan's concurring opinion in *Katz* noted that the place where the search occurs is still important, but established a two-prong requirement for determining when the fourth amendment is triggered. This test has since been adopted by the majority of the Court. (*California v. Ciraolo* (1986), 476 U.S. 207, 211, 90 L. Ed. 2d 210, 215, 106 S. Ct. 1809, 1811.) First, a person must have exhibited an actual (subjective) expectation of privacy in the place searched or thing seized. Second, this expectation must be one that society is willing to

recognize as "reasonable." *Katz*, 389 U.S. at 361, 19 L. Ed. 2d at 588, 88 S. Ct. at 516 (Harlan, J., concurring).

In *People v. Wright* (1968), 41 Ill. 2d 170, this court considered the case in which a police officer watched and listened through a rear window of an apartment from a CTA right-of-way only one to three feet from the building. There it was noted that the *Katz* decision eliminated the former fourth amendment "requirement" that there be a "trespass" before fourth amendment rights were implicated. *Wright* went on to hold, however, that "while the absence of a trespass is no longer to be an adequate ground to justify the admission of evidence secured through use of the natural senses assisted by artificial means, the lack of a trespass is still a *highly relevant* consideration in sustaining the admission of evidence which has fallen into the plain view of an officer, *i.e.*, gathered solely by the use of his natural senses." (Emphasis added.) (*Wright*, 41 Ill. 2d at 175.) The *Wright* decision upheld the introduction of the evidence developed from the officer's investigation, even though such evidence resulted from his eavesdropping into a private residence through an open window.

We believe that under the facts surrounding the conversation overheard by the officers, no fourth amendment "search" can be said to have occurred because defendant did not have a reasonable expectation of privacy in his conversation. Several facts support this conclusion. First, the area where the officers overheard defendant's conversation was a common area shared by other tenants, the landlord, their social guests and other invitees. (See, *e.g., Commonwealth v. Hall* (1975), 366 Mass. 790, 794, 323 N.E.2d 319, 322 (expectation of privacy diminished in common areas of apartment building); *Lorenzana v. Superior Court* (1973), 9 Cal. 3d 626, 629, 511 P.2d 33, 35, 108 Cal. Rptr. 585, 587 ("sidewalk, pathway, common entrance or similar passageway offers

an implied permission to the public to enter which necessarily negates any reasonable expectancy of privacy").) Second, the area where the officers were standing when they overheard the conversation was unlocked. (See *Hall*, 366 Mass. at 794, 323 N.E.2d at 322 (police conduct in deliberately circumventing building security indicated violation of reasonable expectation of privacy).) Third, defendant's voice was raised. (*United States v. Burns* (10th Cir. 1980), 624 F.2d 95 (no privacy interest in conversation loud enough to be overheard outside room); accord *United States v. Llanes* (2d Cir. 1968), 398 F.2d 880, 883-84.) Fourth, the officers used no artificial means to enhance their ability to hear defendant's conversation, nor did they enter an area where they had no legal right to be. (*People v. Wright* (1968), 41 Ill. 2d 170.) While none of these factors is necessarily sufficient alone to justify our conclusion, when taken together, it becomes clear that no fourth amendment search is implicated here.

Nor do we believe that the officers conduct in this case violated the constitutional protections found in article I, section 6, of our State constitution. While it is true that the Illinois Constitution was redrafted in 1970 to include specific protection against "interceptions of communications by eavesdropping devices or other means," the factors which support our fourth amendment analysis also support a finding that the officers' conduct here was not "unreasonable" as that word is used in this section. Therefore, while defendant's State constitutional protections against government "interceptions of communications" were triggered by the police conduct of listening to his conversation, we find no violation of the State constitution.

## II

Defendant next claims that the officers improperly

arrested him in his apartment without a warrant. (See generally *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (officers may not engage in nonconsensual and warrantless entry into home to make routine felony arrest).) At both the suppression hearing and at trial, Officer Simon said that officers drove to defendant's apartment approximately two hours after the murder. The record is unclear whether the officers went to the apartment to arrest defendant or whether they were simply carrying out the investigation as to the facts surrounding the murder. In any event, Simon and another officer entered the unlocked back door of the building after hearing a loud argument from outside. They entered the vestibule or hallway leading to several of the apartments in the building and listened at defendant's door for a minute or two. An officer accompanying Simon looked through a hole in the door. After hearing a woman question a man in the apartment about the presence of blood on his clothing, and hearing the man admit his involvement in a murder, the officers knocked on the apartment door. Defendant answered the door and identified himself. The officers then pulled him out into the hallway and arrested him.

Defendant points to Officer Simon's statements in the record which indicate that "during [the arrest] process I might have taken one step into the apartment." Defendant claims that this intrusion into his home violated the fourth amendment and article I, section 6, of the Illinois Constitution. Defendant points to the *Payton* decision, which states, "[T]he Fourth Amendment has drawn a firm line at the entrance to [a] house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382.

The State relies on *United States v. Santana* (1976), 427 U.S. 38, 42, 49 L. Ed. 2d 300, 305, 96 S. Ct. 2406,

2409, a pre-*Payton* case, for the proposition that the open doorway of a defendant's home is a "public place" for purposes of fourth amendment analysis. The State argues that once police properly encounter a suspect there they may minimally intrude into the home in order to complete an arrest. Assuming that Officer Simon "entered" defendant's home by taking a step into the doorway or reaching in to arrest him the night of the murder, the State argues that so long as he acted in "a fluid and uninterrupted series of events," we should find that defendant's constitutional rights were not violated. A number of Illinois appellate decisions would seem to support this view. *People v. Wolff* (1989), 182 Ill. App. 3d 583; *People v. Hall* (1987), 164 Ill. App. 3d 770; *People v. Lekas* (1987), 155 Ill. App. 3d 391; *People v. Graves* (1985), 135 Ill. App. 3d 727; *People v. Patton* (1984), 122 Ill. App. 3d 46; *People v. Morgan* (1983), 113 Ill. App. 3d 543; *People v. Schreiber* (1982), 104 Ill. App. 3d 618. See also 2 W. LaFave, Search & Seizure §6.1(e), at 590-91 (2d ed. 1987) ("[I]f the arrestee does not retreat from the door but the police officer merely reaches in to manifest the fact of arrest, such a de minimus breaking of the vertical plane above the threshold should not itself make the warrantless arrest unlawful").

We leave for another day the question of whether these cases can be fairly squared with *Payton*, for we find the officer's conduct in this case to have been reasonable due to the "exigent circumstances" which existed at the time of defendant's arrest. Several factors have been identified as being relevant to the question of whether a given factual situation creates an exigent circumstance which justifies the warrantless entry into a home by police, including when: (1) there is involved a grave offense, particularly a crime of violence; (2) the suspect is reasonably believed to be armed; (3) there exists a clear showing of probable cause; (4) there is strong

reason to believe that the suspect is in the premises; (5) there is a likelihood the suspect will escape if not swiftly apprehended; and (6) the police entry, though nonconsensual, is made peaceably. (*People v. Yates* (1983), 98 Ill. 2d 502, 515.) The balance of these factors clearly supports the police conduct here. First, we note the seriousness of the violent crime the officers were investigating and the importance of capturing the victim's murderer quickly. Second, although nothing in the record supports the conclusion that the police believed the suspect to be armed, there is a clear showing of probable cause at the time of defendant's arrest, particularly in light of the suspect's overheard admission of committing a murder that evening. Third, the fact that officers overheard a man in the apartment which had been identified by witnesses as belonging to defendant, when added to the fact that this man admitted involvement in a murder, gave strong assurances to the police that defendant was on the premises before they entered his home. Fourth, while there is nothing to indicate that the suspect was about to take flight from the police at the time they arrested him, we note the peaceable way in which the police effectuated his arrest.

In addition to the factors discussed above, we note two additional considerations important to our decision. The officers here faced the situation in which they were nearly certain that evidence of a murder in the form of bloodstained clothing was just beyond the door and that this evidence would likely disappear absent prompt action. In addition, we believe it important that the police in this case did not delay in moving from the scene of the murder to defendant's home. As the time between when the police formulate probable cause and when defendant is arrested grows longer, the "exigency" of the situation is certainly diminished. Here the record is unclear as to when the police established probable cause

to arrest defendant, *i.e.*, whether the police went to defendant's home to arrest him or merely to interview him. Under either circumstance, however, the period of time between when the police could lawfully arrest defendant and when they in fact did so was brief, a factor which clearly supports the reasonableness of their action. See generally *Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385; 2 W. Lafave, Search & Seizure §6.1(f), at 595-608 (2d ed. 1987).

This court has determined that the protections afforded by article I, section 6, of our State constitution against "unreasonable" searches and seizures are substantially identical to those provided by the fourth amendment. (*People v. Tisler* (1984), 103 Ill. 2d 226, 241-42.) Even if we assume *arguendo* that there has been an in-home seizure in this case, we have already concluded that such seizure was "reasonable" due to the exigent circumstances that surrounded it and, therefore, not a violation of the fourth amendment. For these same reasons, we conclude that there has been no violation of article I, section 6.

### III

Defendant next claims that no one gave valid consent to search his apartment. Police twice searched defendant's home pursuant to separate consents given by Josephine Palomino, defendant's girlfriend. After officers arrested defendant in his doorway, and after the officers sought and received Palomino's consent to search the apartment, officers first seized the clothing that defendant had worn in the bar that evening. Those clothes, found wet in defendant's laundry washtub, contained traces of human blood. The second search was conducted after defendant had been taken to police headquarters. After they obtained Palomino's written consent to search, the officers returned with Palomino to the apart-

ment where she pointed out defendant's bloodstained gym shoes.

Defendant does not contest Palomino's power to consent to these searches. Instead, he argues that she initially gave consent to the officers to enter the apartment only, not to search for evidence. According to the uncontroverted testimony given at the suppression hearing and at trial, however, officers asked her for permission to "look around" and Palomino agreed. Palomino walked with the officers through the apartment and did not protest when they obtained defendant's clothing. Considering the totality of the circumstances, it was objectively reasonable for the officers to conclude that Palomino had consented to a search of the apartment. This conclusion is buttressed by the fact that Palomino later gave her written consent to search the apartment a second time. The trial judge decided that Palomino's consent was freely given, and because that conclusion is not "clearly unreasonable," that decision will not be overturned. *People v. DeMorrow* (1974), 59 Ill. 2d 352, 358-59.

Nor do we agree that Palomino's consent was flawed due to the fact that she may not have understood her right to refuse. The voluntariness of a consent is a question of fact to be determined by the totality of the circumstances. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) None of the appellate cases cited to us by defendant involving force or improper police conduct supports the proposition that police conduct here overcame Palomino's ability to refuse. (See, *e.g., People v. Walters* (1989), 187 Ill. App. 3d 661, 668-69 (consent invalid where police first made illegal entry into home and displayed invalid search warrant); *People v. Vought* (1988), 174 Ill. App. 3d 563, 570-73 (search invalid where police secured consent from hotel manager who had no authority); *People v. Odom* (1980), 83 Ill. App. 3d 1022, 1027-28 (consent given after

illegal gunpoint arrest held invalid).) We find defendant's arguments attacking the searches of his apartment to be meritless.

## IV

Defendant next challenges the decision of the trial judge to admit his written statement, taken at the police station, into evidence. According to the testimony of State's witnesses, Detective McCann began interviewing defendant at approximately 10:45 p.m., about 15 minutes after defendant was brought to police headquarters. McCann read the *Miranda* warnings to defendant, and defendant said he understood his constitutional rights. This interview lasted about 10 to 15 minutes. At this time officers noticed bloodstains on defendant's clothes, and evidence technicians were called to take samples from defendant and his clothing. Officers testified that because they feared he would destroy evidence, defendant's request to use the restroom was temporarily denied. Defendant then participated in a lineup.

At approximately 12:45 a.m., Detective Koclanis began the second interview, which lasted 15 to 20 minutes. Koclanis also gave defendant *Miranda* warnings and defendant again indicated he understood his rights.

At 1:20 a.m., Assistant State's Attorney Edward Edens again gave defendant his *Miranda* warnings, and defendant acknowledged his understanding of his rights for the third time. At the end of this 15 to 30 minute interview, defendant signed the written statement now challenged. Defendant signed a rights waiver within that statement, and he read the statement "line by line" aloud in the prosecutor's presence before signing each page and initialing a minor correction.

Officers testified that defendant was alert and answered questions accurately, and that he did not appear to be under the influence of alcohol or drugs. When in-

terviewed by the prosecutor, defendant did not report abuse from the officers. According to the police, defendant never asked to consult an attorney or his girlfriend, Josephine Palomino.

Defendant mounts a three-way attack against the written statement. First, he claims that the trial judge used an improper legal standard in determining the appropriateness of defendant's written confession. As this court has held, an in-custody confession is given voluntarily only after a knowing and intelligent waiver of the suspect's constitutional rights has been obtained. (*People v. Martin* (1984), 102 Ill. 2d 412, 423-24.) When determining whether a statement is given "voluntarily," we look to the "totality of the circumstances." (*Martin*, 102 Ill. 2d at 426-27.) "The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether defendant's will was overcome at the time he confessed." *People v. Prim* (1972), 53 Ill. 2d 62, 70.

Our review of the record indicates that the trial judge used the appropriate test to judge the voluntariness of defendant's confession here. After observing that defendant had signed a written waiver of the rights enumerated in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the judge said:

"I think that Mr. Smith was given those rights on numerous occasions. I think that he understood those rights. The next question is whether he gave that statement freely and voluntarily or whether in the words of all of the cases, his will was overcome in any regard by the police or any other instrumentality, whether—was this statement freely and voluntarily given, or was there some compulsion, threat, force, bodily injury, et cetera."

There is no indication that the judge misapprehended the law or otherwise used an improper standard. This is not a situation such as that which existed in *People v. Davis*

(1982), 105 Ill. App. 3d 549, 558, where the appellate court concluded that the trial judge misunderstood the fifth amendment and did not know that questioning must cease if the suspect invokes his right to remain silent.

Defendant emphasizes testimony which indicates that he was subjected to physical abuse by the police. He points to testimony given at the suppression hearing in which his girlfriend, Josephine Palomino, indicated that defendant was yelling and screaming and that she could hear a "commotion" in the room where defendant was interrogated. In her words, defendant "was telling the police officers *** to leave him alone, not to touch him, to get away from him, and he was calling for me. I want to talk to Josie. I want to talk to Josie. I want to talk to Josie." At trial Josephine's mother similarly claimed she heard defendant holler "get your fucking hands off of me." This testimony was contradicted, however, by police officers and the assistant's State's Attorney when they testified that no abuse, force, or threats of force were used during their interrogation and that defendant did not yell while being questioned.

It is well established that physical abuse by the police during interrogation will negate any confession which a defendant may make. (See, *e.g., People v. Wilson* (1987), 116 Ill. 2d 29 (State bears burden of proving by clear and convincing evidence no abuse when defendant injured while in custody).) However, equally well established is the rule that a trial judge's determination that a confession was given voluntarily will not be overturned absent a showing that such decision is against the manifest weight of the evidence. (*People v. Martin* (1984), 102 Ill. 2d 412.) When deciding defendant's allegation of physical abuse, the trial judge was faced with the difficult problem of squaring Palomino's testimony with that of the officers and State's Attorney. Although there was some evidence that defendant yelled several times that

evening, we agree with the trial court's determination that there is a distinct lack of evidence to indicate physical abuse or to support defendant's contention that his written statement was obtained improperly. Therefore, we will not overturn the trial court's decision with regard to the statement's voluntariness.

Defendant correctly notes that once an accused subject to questioning by police indicates his desire to cut off questioning, the police must promptly do so. Defendant contends that his statement to the police, "leave me alone," amounted to an invocation of this fifth amendment right and that his written statement to the State's Attorney, having been made after he cut off questioning, must be suppressed. Several court decisions from other jurisdictions give credence to this argument, and courts have generally concluded that even an equivocal invocation of the right to remain silent is sufficient to require the police to cut off questioning. (*State v. Bey* (1988), 112 N.J. 45, 65, 548 A.2d 846, 856; *Christopher v. Florida* (11th Cir. 1987), 824 F.2d 836, 841; *Martin v. Wainwright* (11th Cir. 1985), 770 F.2d 918, 924 n.6.) Indeed, *Miranda* itself stated that an accused had the right in "*any manner*, at any time prior to or during questioning" to invoke the right to remain silent. (Emphasis added.) (*Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627.) Several factors lead us to conclude, however, that defendant did not invoke his fifth amendment right in this case.

Initially, we note that the first time defendant raises this argument was not to the trial judge who had the opportunity to observe the demeanor of the witnesses who testified, but in his briefs to this court. His failure to argue this theory would normally waive this issue, but under our "plain error" doctrine we feel compelled to address defendant's arguments. (134 Ill. 2d R. 615(a).) This is because defendant's confession, if improperly admitted

in violation of the fifth amendment, may have denied him a fair trial. The fact that defendant's counsel did not initially raise this theory, however, gives some indication that defendant did not assert his fifth amendment right at the time of questioning. (See, *e.g., People v. Del Vecchio* (1989), 129 Ill. 2d 265, 276 (counsel's failure to make timely objection indicates lack of sufficient prejudice).) Second, we note that Palomino's testimony was in opposition to testimony provided by the police that defendant did not yell or scream during questioning. Although the trial judge did not find Palomino to be an incredible witness, the fact that her testimony contradicted the testimony of the police undercuts defendant's claim. Third, even assuming that defendant yelled something such as "Get your hands off me, leave me alone," Palomino's testimony fails to sufficiently indicate that defendant was speaking to one of the officers who was then questioning him. Testimony indicated that the officers moved defendant at least once during his interrogation and also that an evidence technician removed bloodstains from defendant's skin while he was in custody. Defendant was no doubt touched on both occasions. We believe that if, for example, defendant's statements were made in response to either the police while they were moving defendant or to the technician while he was removing blood, these statements, taken alone, could not serve to invoke defendant's fifth amendment rights to cut off questioning. Finally, we note that while Palomino's mother testified at trial that defendant raised his voice at one point and yelled, "Get your fucking hands off me!" bolsters Palomino's testimony somewhat, Palomino's mother did not testify that defendant yelled, "Leave me alone!" This omission from Palomino's mother's testimony undercuts defendant's claim.

Defendant argues that at the very least the question of whether he asserted his fifth amendment privilege is

ambiguous and that he should be entitled to a new suppression hearing so that the trial judge may rule on this question. However, in light of the distinct lack of evidence indicating that a fifth amendment privilege was asserted, we deny defendant's claim.

## V

During argument on defendant's pretrial motion *in limine*, the State indicated its intention to offer four-year-old Sirena Moya's statements into evidence through the testimony of Officer Gaynor, the police officer who found Sirena on the night of the murder. The judge ruled that Sirena's statements could be admitted into evidence under the "excited utterance" or "spontaneous declaration" exception to the hearsay rule. Defendant attacks this ruling on several grounds.

When called as a State's witness for the case in chief, Officer Sharon Gaynor testified that she received a radio call of a fight in progress at 8:15 p.m. on March 17, 1987. Gaynor arrived at the victim's apartment within 10 minutes of the call and found the victim's body on the kitchen floor. Gaynor then walked from the kitchen to the bedroom to investigate noises that she heard.

Officer Gaynor found Sirena "huddled in the corner of the bedroom with a blanket pulled over her head." Gaynor told Sirena she was there to help her and "tried [her] best to calm her down." Sitting on the bed next to Sirena, Gaynor explained that she was a police officer, and Sirena provided her name in response to a question from Gaynor. Gaynor then asked Sirena if she knew where her mommy was, and the girl answered her mommy was "out." Gaynor asked who the "lady in the other room" was, and Sirena replied that it was Lisa, her baby-sitter. In Gaynor's words, "I also asked her if there was anybody else home with her that particular evening or in the apartment with her, and she stated

David. I asked her who David was, she said friend of my daddy's." Officer Gaynor replaced the blanket over Sirena's head and escorted the girl out of the apartment. In a personal telephone directory in the kitchen, Gaynor found a name and number for "David Smith," but the number had been disconnected. Acting on Sirena's statements and other information acquired from the victim's family members, police officers arrested defendant in his home at 10 o'clock that evening.

The State initially argued that Sirena's statements were being offered for the nonhearsay purpose of explaining to the jury the police action of arresting defendant. After a court recess, however, the trial court ruled this evidence admissible to prove the truth of the matter asserted under the spontaneous declaration or excited utterance exception to the hearsay rule.

To secure admission of a "spontaneous declaration" or "excited utterance," the proponent of the evidence must demonstrate: (1) the occurrence of an event or condition sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) a statement relating to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 181.) We believe that this court's decision in *People v. Nevitt* (1990), 135 Ill. 2d 423, speaks directly to the question of whether Sirena's out-of-court statements were admissible as an excited utterance.

In *Nevitt*, a day-care worker was accused of aggravated criminal sexual assault upon a three-year-old boy. Five hours after the incident, the boy's mother noticed that her son was unusually withdrawn. When questioned what was wrong, the boy blurted out, "Teacher Tony bit my dingdong." This court held the statement to be admissible under the excited utterance exception despite (1) the significant passage of time between the assault and the statement, and (2) the fact that the statement

was made in response to a question. This court found the statement to be "the product of the event, rather than the child's deliberation." (*Nevitt*, 135 Ill. 2d at 445.) Significant in the *Nevitt* analysis was the fact that the child's first statement to his mother once away from the day-care center related to the incident.

We believe that the same rationale which underlies the *Nevitt* decision applies to this case. With regard to the *Poland* three-part analysis, two of the three elements were clearly met here. First, Sirena was most certainly exposed to a startling event. Medical testimony at trial was clear: Lisa Ferguson was brutally beaten, stabbed and then left to die. Neighbors testified that they heard the victim screaming "Help me! Help me!" Even if Sirena did not witness the murder of her cousin and baby-sitter, however, she certainly heard her screaming for help. Defendant argues that the State has failed to lay a proper foundation to support the fact that Sirena was exposed to a "startling occurrence," but we strongly disagree with this characterization. Officer Gaynor's testimony that Sirena was "huddled in the corner of the bedroom with a blanket pulled over her head" and that Gaynor "tried [her] best to calm her down" convinces us that Sirena was sufficiently unnerved by the event to make her statements "excited." Nor do we believe that Gaynor's efforts to calm Sirena down or to get her to respond to questions reduced the tension of the event below what is necessary under the excited utterance exception.

Second, assuming for the sake of argument that Sirena had some motive to fabricate testimony to Officer Gaynor, we do not believe that Sirena had sufficient time to do so here. Evidence indicated that Gaynor was in the apartment within 10 minutes of the time the victim was heard screaming. We do not require the time between when the startling event occurs and when the declarant

makes statements in response to that event to be contemporaneous. (See, *e.g., People v. Gacho* (1988), 122 Ill. 2d 221 (statement made by declarant after 6½ hours locked in car trunk falls within exception).) "The proper question is whether the statement was made while the excitement of the event predominated." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.3, at 627 (5th ed. 1990).) Moreover, it is significant that the first person Sirena was able to speak to following the murder was Officer Gaynor. (*Nevitt*, 135 Ill. 2d at 445; *Gacho*, 122 Ill. 2d at 241.) Nor does the fact that Sirena spoke after being prompted by Officer Gaynor destroy the spontaneity of Sirena's statement. (*Gacho*, 122 Ill. 2d at 242 ("That the statement was made in response to a question *** does not necessarily destroy its spontaneity").) The short period of time involved here meets the second element of the *Poland* analysis.

Defendant argues that the State has failed to lay the foundation for the third element of the *Poland* inquiry, *i.e.,* whether the statement related to the startling event. Defendant's counsel characterizes Sirena's statement as merely indicating that David was in the apartment sometime that evening, not that David was in the apartment during the murder. Our review of the record indicates that any lack of foundation here is likely the result of the fact that the State sought to introduce this evidence initially only to explain the conduct of the police in arresting defendant, not to show that he committed the crime. Even if we were to accept defendant's characterization of Sirena's statements, however, we do not believe that the lack of foundation would be fatal to the State's use of the excited utterance exception. As *Nevitt* makes clear, the *Poland* elements are taken *as a whole*, not as individual preconditions necessary to establish the existence of the hearsay exception. (*Nevitt*, 135

Ill. 2d at 444-45.) We find that Sirena's statements were properly admitted by the trial court under the excited utterance exception to the hearsay rule.

Defendant next argues that Sirena's statements should not have been admitted due to the fact that there was no determination that she was competent to testify at trial. He claims that it is, therefore, unfair to admit Sirena's statements by misdirection through use of the excited utterance hearsay exception.

We note, however, that absent a showing by *defendant*, Sirena was qualified to testify in spite of her young age. (Ill. Rev. Stat. 1989, ch. 38, par. 115—14.) Defendant made no such showing. Even if it is assumed that Sirena was incompetent to testify, however, we believe that the utterances made here are sufficiently reliable to have been admitted. We note that the trustworthiness of Sirena's statement stems not from her competency, but rather from the unique circumstances in which her statements were made. We agree with our appellate court that a declarant's competency is not relevant to the admission of excited utterances. *People v. Merideth* (1987), 152 Ill. App. 3d 304, 312; *People v. Miller* (1978), 58 Ill. App. 3d 156, 160 (each admitting excited utterances of four-year-old children found incompetent to testify).

Defendant also argues that he was deprived his right to confront Sirena as a witness against him, in violation of his Federal and State constitutional rights. He points to *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531, which states that "[i]n the usual case *** , the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." Once the witness has been shown to be unavailable, then the State must also prove the evidence bears adequate " 'indicia of reliability' " to be admissible. *Roberts,* 448 U.S. at 65, 65 L. Ed. 2d at 607, 100 S. Ct. at 2538-39.

The United States Supreme Court has recently addressed the question raised by defendant. In *White v. Illinois* (1992), 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736, the Court limited its holding in *Roberts* by emphasizing that " '*Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts.' " (*White,* 502 U.S. at 354, 116 L. Ed. 2d at 858, 112 S. Ct. at 741, quoting *United States v. Inadi* (1986), 475 U.S. 387, 394, 89 L. Ed. 2d 390, 398, 106 S. Ct. 1121, 1125.) *White* went on to hold that because the excited utterance exception to the hearsay rule provides unique protections as to trustworthiness, no confrontation clause concerns are raised when this exception is invoked. As the Court stated, "where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." (*White,* 502 U.S. at 356, 116 L. Ed. 2d at 859, 112 S. Ct. at 743.) We find the same to be true under our own constitution. (Ill. Const. 1970, art. I, §8.) Defendant was not, therefore, improperly denied his right to confront Sirena.

## VI

Before establishing the circumstances of the victim's death, prosecutors proved a number of preliminary matters. The State first called the victim's mother, Marie Munoz, as a life and death witness. Munoz testified that the victim, Lisa, had been living with her aunt, Juanita Soto, on March 17. Soto then testified as the second witness. Without defense objection, Soto named all of the residents of her home, including her children, Sirena and Sirena's new baby sister, Lisa, born September 13, 1987. Defendant now claims Juanita's reference to her child Lisa, named in memory of the victim, violated his rights under State law and the eighth and fourteenth amendments as an impermissible victim impact statement.

Because defense counsel did not challenge this evidence in any way either at trial or in his post-trial motion, however, this issue is waived. *People v. Free* (1988), 122 Ill. 2d 367; *People v. Walker* (1985), 109 Ill. 2d 484 (capital cases in which claims of impropriety of victim impact statement were waived).

## VII

Defendant challenges the trial court's decision to admit a photograph of Sirena Moya into evidence. Without defense objection, the prosecutors showed this exhibit to the witnesses for their identification. Counsel later objected when the exhibit was offered into evidence. The judge admitted the photograph but refused to send it to the jurors for their deliberations.

The decision to admit a photograph into evidence is best entrusted to the trial court's sound discretion. Considerable deference is accorded the exercise of that discretion on appeal. (*People v. Fierer* (1988), 124 Ill. 2d 176, 193.) Photographs, like any evidence, may be admitted into evidence when authenticated and relevant either to illustrate or corroborate the testimony of a witness, or to act as probative or real evidence of what the photograph depicts. "[R]elevant evidence is evidence that in some degree advances the inquiry. It is material and probative. As such, it is admissible, at least prima facie. But this relevance does not ensure admissibility. There remains the question of whether its value is worth it [*sic*] costs. A great deal of evidence is excluded on the ground that the costs outweigh the benefits." E. Cleary, McCormick on Evidence §185, at 544 (3d ed. 1984).

In *People v. Foster* (1988), 119 Ill. 2d 69, this court addressed the question of whether photographs admitted into evidence of a child asleep in the apartment where a murder took place unfairly prejudiced defendant. The *Foster* decision noted that "the photographs were irrele-

vant and prejudicial because their admission may have suggested to the jury that it was material to a finding of guilt that the deceased left a family. Evidence indicating that the victim left a family is improper, as it is without bearing on the guilt or innocence of the accused." (*Foster*, 119 Ill. 2d at 88-89.) The State claims that it sought to introduce the photograph into evidence merely as cumulative evidence that Sirena was in the apartment at the time of the murder and to show that she was four years old. We find the State's justification for offering the photograph to be contrived. However, even if we assume, as defendant suggests, that the State sought to introduce the photograph into evidence merely to play upon the sympathies of the jurors, we do not believe that the photograph of Sirena prejudiced the jury's decision, particularly in light of the fact that the picture was never published and that the State did not refer to this evidence in its closing argument. While we conclude that the trial judge's acceptance of the photograph into evidence was error, we find its admission to have been harmless.

Defendant also challenges the decision of the trial court to admit a life photograph of the victim into evidence and to send this photograph to the jurors for their deliberations during the guilt-innocence phase of the proceedings. Because defendant had not contested the fact of the victim's death, counsel reasoned, the photograph was irrelevant to any issue in the case. The trial judge overruled his objections without comment. Defendant also complains that the photograph was so unfairly prejudicial to his client's case as to amount to an abuse of discretion by the trial judge. However, in *People v. Morgan* (1991), 142 Ill. 2d 410, 461-62 (*rev'd on other grounds* (1992), 504 U.S. ___, 119 L. Ed. 2d 492, 112 S. Ct. 2222), this court considered the very issue now raised by defendant and determined that a life photo-

graph of the victim may be admitted as part of the *corpus delicti* of the murder, as well as to corroborate testimony from a "life and death" witness. We decline to overrule that holding here.

## VIII

Defendant next challenges the trial court's decision to exclude hearsay evidence offered by his attorney. Counsel wanted to prove defendant denied the murder when he was interrogated by Detective McCann. Counsel also sought to prove Josephine Palomino was unable to speak to defendant at police headquarters. Defendant now argues that a constitutional right to present this evidence was denied to him.

When defendant was first questioned by Detective McCann at 10:45 p.m., defendant apparently denied the murder. After defendant was identified in a police lineup, however, and after officers noticed bloodstains on defendant and arranged for forensic testing, defendant at 1:20 a.m. admitted the killing to Assistant State's Attorney Edens. Before calling McCann to the witness stand, the prosecutor moved *in limine* to preclude any hearsay evidence of defendant's initial claim of innocence. The judge sustained the motion but ruled that counsel could prove defendant made some sort of statement to McCann.

We think that there can be little doubt that any denials made to the police in this case amount to hearsay evidence. Defendant claims that he offered his exculpatory statements in order to prove "the state of mind of Detective McCann as to what he did subsequent to listening to the denial by David Smith." According to defendant's counsel, McCann, upon hearing defendant's denial, left the room and got another officer to take photographs of defendant. While it is true that statements are not hearsay unless "offered to prove the truth of the matter as-

serted," we have difficulty understanding how defendant's initial denial connected to Officer McCann's decision to have photographs taken of defendant or how this decision was relevant to defendant's case. Absent a showing by counsel that evidence is offered for some relevant nonhearsay purpose, we believe that the trial judge correctly concluded that the statements were being "offered to prove" the proposition that defendant did not commit the murder, "the matter asserted." As hearsay statements, they were properly refused into evidence.

Nor do we believe that defendant was, by application of the hearsay rule, denied a fair opportunity to present his case to the jury. While the compulsory process, confrontation or due process clauses of the Federal and State Constitutions assure a defendant's right to present his version of the case (*Washington v. Texas* (1967), 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920 (compulsory process or confrontation clause of sixth amendment); *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (due process)), a defendant is not free to ignore the "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence" (*Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois* (1988), 484 U.S. 400, 410, 98 L. Ed. 2d 798, 811, 108 S. Ct. 646, 653.

Nor do we believe that the trial judge's decision not to let defendant introduce evidence that officers prevented him that evening from seeing his girlfriend, Josephine Palomino, constituted reversible error. Palomino's testimony at the suppression hearing indicated that she sought to see defendant while he was being questioned

while, at the same time, he was attempting to see her. She testified that at one point a police officer told her that she could not see defendant until he had made a statement. Defense counsel thereafter argued that this evidence tended to show that defendant's confession was made involuntarily. At both the suppression hearing and at trial, however, Detectives McCann and Koclanis testified that defendant never asked to see Palomino. Instead of calling her as a witness at trial and questioning her directly as the trial judge suggested, defense counsel called Palomino's mother in an effort to get her to repeat the conversation Palomino allegedly had with one of the officers. The trial court properly sustained the State's objection to this testimony.

## IX

Defendant next points to arguments made by the State in closing which he claims were improper. While summarizing the evidence presented, the prosecutor asked "What about Lisa Ferguson, who was a citizen of Chicago. What about Lisa Ferguson who was in this apartment alone with Sirena that night, what about her rights?" The trial judge sustained defense counsel's objection and later instructed the jury that counsel's arguments were not evidence. Defendant now claims that this remark infringed upon his rights under State and Federal law. (See *Donnelly v. De Christoforo* (1974), 416 U.S. 637, 40 L. Ed. 2d 431, 94 S. Ct. 1868.) While we agree with defendant that the prosecutor's remarks at closing were improper, we find that defendant was not prejudiced by this remark.

As defendant correctly notes, this court has condemned prosecutorial references to the rights of the victim or the victim's family which tend to distract jurors from their consideration of the evidence of defendant's guilt. (See, *e.g., People v. Kokoraleis* (1989), 132 Ill. 2d

235, 285-86; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 37.)
Not every reference to a victim's rights will entitle a
defendant to a new trial, however. Reversal of conviction
is appropriate only when the overall fairness of the trial
has been compromised by the prosecutor's argument.
This court has specifically ruled that a prosecutor's re-
marks do not require reversal if the State's evidence of
guilt was "substantial" rather than closely balanced.
(*People v. Henderson* (1990), 142 Ill. 2d 258, 322-26.) We
do not believe that the evidence in this case was "closely
balanced."

The prosecution's evidence of defendant's guilt was
strong: (1) friends and members of the victim's family
provided circumstantial evidence placing defendant near
the crime scene at the time of the murder; (2) Officer
Gaynor testified that Sirena Moya told her that a family
friend named "David" was in the apartment that eve-
ning, and defendant's name and telephone number were
found in an address book in the victim's apartment; (3)
when police officers went to defendant's apartment, they
heard defendant admit killing someone that evening; (4)
in a subsequent written statement, defendant described
how he forced his way into Lisa Ferguson's apartment,
where he stabbed her with a knife he found in the
kitchen; (5) significant amounts of blood were found on
defendant's body and on his clothing when arrested by
police; and (6) testimony indicated that defendant tried
to destroy this evidence by washing both his clothing
and his hair shortly after the crime had been committed.
While defense counsel insists that this evidence is
"largely circumstantial and not overwhelming," we be-
lieve that this characterization of the evidence lacks can-
dor.

When the prosecutor mentioned the rights of the vic-
tim in his closing argument, the trial court judge
promptly and properly sustained counsel's objection and

later reminded the jury that argument is not evidence. These actions are sufficient in most cases to neutralize any error or potential prejudice to defendant. (*People v. Jones* (1982), 94 Ill. 2d 275, 298-99.) Considering the strength of the State's evidence in this particular case, however, we believe that the jury's verdict was not prompted by an isolated remark which referred to the victim's rights in a vague and general manner. Because defendant's guilty verdict was supported by overwhelming evidence, including defendant's written confession, we find that the prosecution's remarks, although improper, did not deny defendant a fair trial.

Defendant next claims that because "specific guarantees of the Bill of Rights" are involved, we must analyze his claim under the standards of *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824. Under this analysis the question to be answered is whether, absent the constitutional error, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict. We are unable from defendant's briefs to discover which specific right beyond those generally guaranteed by the due process clause he claims was denied to him, however. In our view, this issue falls under the rule adopted in *Donnelly v. De Christoforo* (1974), 416 U.S. 637, 40 L. Ed. 2d 431, 94 S. Ct. 1868, in which the proper analysis is simply whether the conduct has made defendant's trial "so fundamentally unfair as to deny him due process." (*Donnelly*, 416 U.S. at 645, 40 L. Ed. 2d at 438, 94 S. Ct. at 1872.) Nonetheless, we have no difficulty in finding, beyond a reasonable doubt, that the jury would have returned a guilty verdict based upon the evidence presented here absent the prosecutor's misconduct.

## X

Defendant proceeded to trial on two counts of aggra-

vated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(2)) which alleged that defendant had stabbed, choked and beaten Lisa Ferguson about her body with a knife and his hands while he committed an act of sexual penetration by force or threat of force. Count XIII of the indictment specifically identified the act of sexual penetration as contact between defendant's penis and the victim's anus. Count XV alleged sexual penetration by means of insertion of an object into the victim's anus. Other counts of aggravated criminal sexual assault alleging vaginal penetration had already been nol-prossed by the State before trial. Over defendant's objection, the jury was given an instruction taken from Illinois Pattern Jury Instructions, Criminal, No. 11.65 (2d ed. Supp. 1989). The pattern instruction defines the term "sexual penetration" in the same manner as that provided by the statute:

> " 'sexual penetration' means any contact, however slight, between the sex organ of one person and the *sex organ, mouth or anus of another person*, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the *sex organ or anus of another person*, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f).)

Defendant contends that, because the State did not try him on a theory of vaginal penetration of the victim, he was denied due process of law when the court failed to delete any reference to "the sex organ of another person" from this instruction.

We find defendant's arguments in this regard to be meritless. The indictment counts for which defendant was tried alleged penetration of the victim's anus, and the prosecutor urged the same theory of the crime in his closing arguments to the jury. The evidence at trial

tended to show that defendant had penetrated the victim's anus during sexual assault. The victim's unclothed body was found face down on the floor and a curling iron, on which there were traces of blood, was discovered under her buttocks. In addition, traces of dried blood were found on the inside of defendant's underwear. The pathologist found tears and laceration of the victim's anus and rectum consistent with forced penetration of the anus by either a penis or object such as a curling iron. There is, then, no reasonable possibility that the jury convicted defendant on a vaginal penetration theory not presented to it. Nor do we believe that the words "sex organ of another person" could have had any bearing on the jury's decision to convict defendant. *People v. Hines* (1964), 30 Ill. 2d 152, 155-56 (jury instruction covering nol-prossed charge did not mislead jury based upon evidence presented to them).

## XI

Defendant next argues that the trial judge's decision to exclude two veniremen because he believed they had lied under oath constituted error. During *voir dire* examination the trial court asked each potential juror if he had ever been accused of a crime. The State had already checked the criminal histories of venire members, however, and the jurors' rap sheets apparently indicated that two venire members had been charged with criminal offenses in the past. The prosecutors revealed this information during sidebar conferences and tendered the rap sheets to defense counsel for his inspection. The trial judge then looked at the records himself, determined that the first venireman had lied, and excused him for cause on the State's motion. Later the judge questioned a second venire member about criminal conduct and this member denied that he had ever been accused of a crime. The judge refused to examine the second venire-

man in chambers, as defense counsel suggested at a sidebar conference, preferring instead to question him in open court to see if he had misunderstood the initial questioning. The following exchange occurred:

"COURT: Have you ever been an accused, complainant or a witness in a criminal case?

VENIREMAN: No.

COURT: You never have?

VENIREMAN: No.

COURT: Never in your life?

VENIREMAN: No."

The judge then excused this venireman for cause as well.

We decline to make a lengthy analysis of this issue, which we believe to be without merit. The veracity of those who testify during *voir dire* is a matter solely within the sound discretion of the trial judge. (*People v. Hyche* (1979), 77 Ill. 2d 229, 239; *People v. Cole* (1973), 54 Ill. 2d 401, 414.) The decision to excuse a potential juror because of a reasonable belief that the potential juror has lied under oath is a question clearly best left with the trial court.

## XII

Having determined that defendant received a fair trial on the question of his guilt, we now turn to the sentencing phase of his hearing. Here defendant raises 11 distinct issues: (1) whether the trial court's refusal to "life-qualify" the jurors amounted to constitutional error, (2) whether testimony regarding his alleged misconduct in the Cook County jail was improperly admitted, (3) whether the admission of a life photograph of the victim at the death-sentencing stage was improper, (4) whether the trial court's decision to exclude certain evidence offered in mitigation violated defendant's rights, (5) whether the verdict form used by the trial court violated defendant's eighth amendment rights, (6) whether the in-

structional phrase "no significant history of prior criminal activity" is unconstitutionally vague, (7) whether comments by the prosecutor during closing arguments denied defendant his rights under the fifth, sixth, eighth or fourteenth amendments, (8) whether the decision to allow the prosecutor to argue first and last to the jury was improper, (9) whether the imposition of the death penalty is excessive, (10) whether the trial court improperly denied defendant's request for a directed verdict of no-death after seven hours of jury deliberations and (11) whether the Illinois death penalty statute is unconstitutional. Because we find in defendant's favor on the first of these questions, we decline to address the remaining issues.

Prior to jury selection, defense counsel asked the trial judge to supplement *voir dire* examination by asking potential jurors if they would vote for the death penalty in every murder case. This request was denied. Defendant claims in his brief that this refusal to "life-qualify" or "reverse-*Witherspoon*" the jury (see *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770) amounted to a violation of his Federal constitutional rights under the sixth, eighth and fourteenth amendments, as well as under his corresponding State constitutional rights. The defendant made this claim in spite of this court's decisions in *People v. Morgan* (1991), 142 Ill. 2d 410, and *People v. Hope* (1990), 137 Ill. 2d 430 (trial court's refusal to life-qualify jurors on a motion by defendant held not to constitute *per se* error).

The United States Supreme Court has recently overruled this court's decision in *People v. Morgan*. (*Morgan v. Illinois* (1992), 504 U.S. ___, 119 L. Ed. 2d 492, 112 S. Ct. 2222.) The Court there specifically addressed the question now at issue and held that the due process clause of the fourteenth amendment requires an Illinois trial judge to inquire, when requested to do so, whether

a potential juror would automatically impose the death penalty upon conviction of defendant. Because the trial court below refused defendant's request to question the jury in this regard, defendant was denied due process and is entitled to a new sentencing hearing.

## CONCLUSION

We affirm defendant's convictions but find that the trial court's refusal to "reverse-*Witherspoon*" or "life-qualify" the jury over defendant's objection amounted to a violation of defendant's due process rights under the fourteenth amendment. (*Morgan v. Illinois* (1992), 504 U.S. ___, 119 L. Ed. 2d 492, 112 S. Ct. 2222.) Therefore, the cause is remanded for a new sentencing hearing consistent with this opinion.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded.*