THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES CALVERT, Defendant-Appellant.

Fifth District    No. 5—92—0501

Opinion filed February 10, 1994.—Rehearing denied March 15, 1994.

Ronald A. Niemann, of Niemann & Parker, of Centralia, for appellant.

David L. Miller, Special Prosecutor, of Corbell & Miller, of Vandalia (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RARICK delivered the opinion of the court:

Defendant, James Calvert, a Fayette County deputy sheriff, was charged by indictment with harassment of a witness and aggravated assault. (Ill. Rev. Stat. 1991, ch. 38, pars. 32—4a, 12—2(a)(10).) In a jury trial, he was convicted of harassment of a witness and acquitted of aggravated assault. Defendant was sentenced to 30 months' probation and fined $3,158. On appeal, defendant contends that (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt; (2) he was denied his first amendment right to freedom of speech because the statute under which he was convicted was unconstitutionally overbroad and vague; (3) the trial court erred by allowing the introduction into evidence of a police department communications monitor tape which picked up the conversation upon which the harassment charge was based; and (4) the trial court committed reversible error by interrupting defense counsel in the absence of objections by the special prosecutor, creating an impression in the minds of the jurors that the court favored the State.

Complainant, Michelle Bradshaw, is a dispatcher for the Vandalia police department. On May 22, 1991, she testified at a hearing in a Fayette County traffic case, No. 91—TR—816, People v. Earth, regarding mishandling of the traffic citations issued to Ms. Earth by the arresting officer, Robyn Shukar, a patrolman for the Vandalia police department. In the course of that testimony, Ms. Bradshaw made statements regarding the prior romantic involvement of defendant, a married man, with Ms. Earth, an underage woman, and regarding defendant's role in the initial undercharging of Ms. Earth by Shukar.

Three days later, defendant came to the Vandalia police department just after the complainant went on duty. He berated the complainant for revealing in the course of her testimony that defendant had an affair with Ms. Earth. Defendant's language was rife with profanity and invective. He screamed at Ms. Bradshaw, verbally abusing her for second-guessing a police officer, threatened to "nail" complainant and her fiance if they did anything wrong in the future, threatened to call the wife of the Vandalia chief of police and tell her that complainant was engaged in a sexual relationship with the chief of police, told complainant that she had better watch herself because defendant was going to get her, and invited complainant's fiance to fight with the defendant. Complainant left the dispatcher's booth, and defendant backed her up against the Coke machine in the lobby of the police department. Complainant described defendant as very upset, screaming and spitting in her face as he jabbed his finger at her and shook his fist. Because the complainant was so frightened at the time, she could not remember everything defendant said. She believed at several points that defendant, a large man, was going to strike her with his fists. Defendant turned to leave after he finished his diatribe, and complainant became angry because defendant had backed her into a corner and frightened her so badly with his verbal assault. She grabbed the bar on the front door of the lobby to prevent defendant from leaving and began to complain of his treatment of her. Defendant pushed the door open, and the confrontation continued in the street in front of the Vandalia police department. Insults were exchanged and the defendant drove away.

Complainant returned to the dispatcher's desk and called the Vandalia chief of police to relate what had happened. She testified, "I was angry, I was upset, I was hurt, I was cryin, [sic] so hard I couldn't hardly [sic] talk to the chief on the phone." She cried continuously for one-half hour after defendant left and intermittently for another half-hour. Complainant, who is 5 feet 6$^{1}/_{2}$ inches tall, testified that she was physically intimidated by the defendant, who is 5 feet 11 inches tall and weighs 240 pounds. Witnesses testified that after the incident the complainant was flushed, tearful, and shaky.

Defendant asserts that the evidence was insufficient to establish that he had the requisite intent to harass or annoy the complainant to allow him to be convicted under section 32—4a of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 32—4a). We disagree.

Section 32—4a of the Code provides as follows:

"A person who, with intent to harass or annoy one who had served as a juror or as a witness in a legal proceeding, because of

the \*\*\* testimony of such witness, communicates directly or indirectly with a juror or witness in such manner as to produce mental anguish or emotional distress or who conveys a threat of injury or damage to the property or person of such party or witness \*\*\* commits a Class 4 felony." Ill. Rev. Stat. 1991, ch. 38, par. 32—4a.

Harassment of a witness as statutorily defined is a specific-intent crime. (*People v. Nix* (1985), 131 Ill. App. 3d 973, 975, 476 N.E.2d 797, 799.) Intent must of necessity in most instances be determined by the defendant's conduct and the circumstances surrounding the complained-of act, rather than by direct evidence. (*People v. Dugan* (1992), 237 Ill. App. 3d 688, 700, 604 N.E.2d 1117, 1125.) In order to convict a defendant of harassment of a witness, the State must prove the defendant intended to harass or annoy. (*People v. Berg* (1991), 224 Ill. App. 3d 859, 862, 586 N.E.2d 649, 650.) Defendant was charged by indictment under section 32—4a with having communicated with the complainant with the intent to harass or annoy in a manner such that it produced mental anguish and emotional distress.

■ Harassment is not defined in the Code. However, the definition of harassment in the Domestic Violence Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 2311—3(6)) is instructive. Harassment is defined as:
"[K]nowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress \*\*\*." (Ill. Rev. Stat. 1991, ch. 40, par. 2311—3(6).)
Harassment is the result of intentional acts which cause another person to be worried, anxious, or uncomfortable and therefore can occur even if there is no overt act of violence. (*People v. Zarebski* (1989), 186 Ill. App. 3d 285, 294, 542 N.E.2d 445, 452 (appeal from conviction of violation of order of protection issued pursuant to the Act).) Complainant's testimony and that of the Vandalia chief of police and others clearly established that defendant's conduct served no reasonable purpose. It was such that it would cause a reasonable person emotional distress and in fact did cause complainant emotional distress. Complainant and other witnesses testified that complainant suffered considerable emotional turmoil and anxiety long after defendant ceased his abusive behavior and departed. Defendant's act undoubtedly constituted harassment of the complainant.

The fact that the complainant left the relative security of the dispatcher's booth and entered the lobby does not alter our assessment of the conduct of the defendant. It is the defendant's conduct and intent that govern our decision, not that of his victim. Although

the complainant overcame her initial trepidation and stood up to the defendant, the situation quickly evolved into one in which the defendant's intentions became frighteningly clear. The complainant testified: "[H]e got down in my face and was screamin' [sic] and spitting at me and his face was red and muscles were bulging out of his neck and he was jabbin [sic] his finger at me like this and he had his fist up and he was shaking' [sic] it at me, and he was screaming a bunch of stuff that I can't even remember now because he scared me at that point so bad." It would not further the interests of justice if the complainant's courage in facing her intimidator was deemed to somehow negate his intent.

The circumstances surrounding defendant's actions lead us to the equally certain conclusion that the harassment was intentional. Defendant had been ordered by the sheriff of Fayette County to desist from his habit of dropping in to visit the Vandalia police department while on duty. Defendant had a close friendship with the complainant and was aware that she was regularly scheduled to work the 10 p.m. dispatcher shift. On the night in question, defendant was dispatched to a Bluff City address in Fayette County by the Fayette County sheriff's office radio operator at 9:49 p.m. At 9:50 p.m. defendant called the Vandalia police department dispatcher to ask that a license plate be checked via the computer. At 9:51 p.m. defendant radioed the Fayette County sheriff's office dispatcher to report he was getting out of his patrol unit at the Vandalia police department. Defendant entered the building, confronted the complainant, and left. At 9:57 p.m. he radioed the Fayette County sheriff's office dispatcher to say that he was back in his unit.

The jury logically could have concluded that defendant's actions were consistent with and indicative of the intent to harass the complainant. Defendant knew the complainant was normally scheduled for duty on the 10 p.m. shift. Although defendant had been ordered to respond to a call out in the county, he radioed a license plate check to the Vandalia police department as a pretext to ascertain whether or not the complainant had taken over radio dispatcher duties. The timing of his "exiting unit" radio call to the Fayette County sheriff's office, only one minute after the license plate check call, indicates that defendant was in the immediate area of the Vandalia police station when the call was made. Upon discovering complainant had assumed her duties early, defendant immediately entered the station and began his verbal assault upon her.

The defendant's actions and statement were undeniably prompted by the complainant's testimony at the Earth hearing. His verbal attack was prefaced with a question about why complainant had

testified at the May 22, 1991, hearing that defendant had an affair with Earth, a private matter defendant had divulged in the context of his friendship with complainant. Because of the obvious nexus between the complainant's testimony and defendant's actions, defendant's reliance on *Nix* (131 Ill. App. 3d at 975, 476 N.E.2d at 799) is misplaced. In *Nix*, defendant's comments, "how's it going?" and "I want to talk to you," made in the context of a fortuitous meeting in a restaurant between defendant and an undercover narcotics agent who testified against him, were insufficient to create an inference that the defendant intended to harass the agent because of her witness status. The defendant's statements herein cannot be described as "mild" or "innocuous," and the circumstances surrounding the incident lead to the conclusion that the defendant's presence at the Vandalia police department was not in any way "thoroughly coincidental" but was the product of "advance planning on the part of the defendant." See *Nix*, 131 Ill. App. 3d at 975, 476 N.E.2d at 799.

The instant case closely parallels that of *People v. Berg* (1991), 224 Ill. App. 3d 859, 863, 586 N.E.2d 649, 650. The defendant in *Berg* confronted a social worker, who had testified regarding defendant in a child-custody hearing, as she waited for an elevator after the hearing. Defendant came close to the complainant, raised his voice as he asked why she lied in court, clenched his fists, and appeared very angry as he approached her. He told complainant she was going to be "really sorry" for her testimony. He began to point at the complainant and said, "you are going to pay for what you said, and you are going to pay soon." The reviewing court found the circumstances of the meeting led to the conclusion that defendant waited for the witness, approached her quickly and purposefully, and desisted only when requested to do so by a uniformed deputy sheriff. It found that, unlike *Nix*, the meeting was clearly not a chance encounter and that defendant's words were intentionally delivered with the intent to annoy or harass. (*Berg*, 224 Ill. App. 3d at 862-63, 586 N.E.2d at 651-52.) The facts of the instant case lead this court to the same conclusion.

The decision of the jury, which had the opportunity to listen to the evidence, observe the demeanor of the witnesses, and assess their credibility, is entitled to great deference on review. (*People v. Duplessis* (1993), 248 Ill. App. 3d 195, 200, 618 N.E.2d 1092, 1096, citing *People v. Jimerson* (1989), 127 Ill. 2d 12, 43, 535 N.E.2d 889, 903.) Given the evidence in the record which supports the guilty verdict, we will not disturb the jury's decision.

■ Defendant argues that his first amendment right to freedom of speech was abridged through the prosecution herein. He asserts that

the harassment of a witness statute allowed his prosecution merely because the complainant found the content of his speech offensive. Defendant maintains that because his speech did not provoke imminent lawless action or constitute fighting words that inflicted injury or incited an immediate breach of the peace, the State cannot constitutionally regulate that speech. We believe that defendant's first amendment rights are not implicated by the enforcement of this statute.

Our supreme court found that activities which the State may otherwise validly proscribe are not drawn within the protection of the first amendment merely by virtue of the fact that some or all of their elements are verbal in nature. (*People v. Williams* (1990), 133 Ill. 2d 449, 456, 551 N.E.2d 631, 634.) Threats, bribes, intimidation, extortion, and solicitation are crimes wherein communication via speech is at the heart of the criminal act, and yet the State may constitutionally proscribe these acts. (See *Williams*, 133 Ill. 2d at 456-57, 551 N.E.2d at 634.) In *People v. Blackwood* (1985), 131 Ill. App. 3d 1018, 476 N.E.2d 742, the defendant was prosecuted for violating an order of protection by yelling epithets at his ex-wife, telling her that she was "dead," a plot was waiting for her, it was not over, and defendant would get his chance. He asserted on appeal that the proscription of threatening or harassing his ex-wife chilled his exercise of first amendment rights. The court found that "[t]he only speech for which defendant could reasonably be punished under the [Domestic Violence] Act [was] that form of expression which would not be subject to constitutional protection under any circumstances." (*Blackwood*, 131 Ill. App. 3d at 1024, 476 N.E.2d at 746.) Defendant's speech in the instant case is similarly devoid of constitutional protection. It did not chill defendant's first amendments rights to be sanctioned for threatening, harassing conduct which was accompanied by abusive invective which included an invitation for the complainant's fiance to fight, which surely constituted "fighting words" under anyone's definition.

Defendant also challenges the constitutionality of the statute on the grounds that it is overbroad because it would allow prosecutions for innocent acts which are interpreted by the witness as harassment. He also asserts that the statute is vague because, as written, it is insufficient to apprise even a wary reader of what conduct is prohibited.

■ A statute is constitutionally overbroad if it may reasonably be interpreted to prohibit conduct which is constitutionally protected. (*People v. Smith* (1993), 245 Ill. App. 3d 712, 719, 614 N.E.2d 1326, 1332, *aff'd in part, vacated in part on other grounds, and remanded*

(1992), 152 Ill. 2d 229, 620 N.E.2d 417; *People v. Anderson* (1992), 148 Ill. 2d 15, 26, 591 N.E.2d 461, 465.) It is necessary for a statute to be substantially overbroad before a statute which reflects legitimate State interests is rendered unconstitutional. (*Williams*, 133 Ill. 2d at 456, 551 N.E.2d at 633, citing *New York v. Ferber* (1982), 458 U.S. 747, 73 L. Ed. 2d 1113, 102 S. Ct. 3348.) The State has a strong interest in protecting the witnesses upon whose testimony it must rely to enforce the laws of this State from the harassment proscribed in the statute in question and the consequences thereof. The statute requires that the conduct which exposes a defendant to prosecution be done with the intent to harass or annoy the witness. The explicit requirement of specific intent removes the statute from any possibility of interpretation as an absolute liability offense or application to the hypothetical situations postulated by defendant.

Defendant asserts the language of the statute is so vague that it provides insufficient guidance as to what conduct constitutes a violation of the statute. We cannot agree.

A law is unconstitutionally vague and therefore void if persons " 'of common intelligence must necessarily guess at its meaning and differ as to its application.' " (*Ardt v. Illinois Department of Professional Regulation* (1992), 154 Ill. 2d 138, 157, 607 N.E.2d 1226, 1234, quoting *Connally v. General Construction Co.* (1926), 269 U.S. 385, 391, 70 L. Ed. 322, 328, 46 S. Ct. 126, 127.) A statute does not violate the due process clause of the United States Constitution or the Illinois Constitution, on grounds of vagueness, if it is explicit enough to serve as a guide to those who must comply with it. (*Ardt*, 154 Ill. 2d at 157, 607 N.E.2d at 1235.) A person may be prosecuted under a statute if his conduct clearly falls within the statutory proscription even if the statute may be vague as to other conduct. *Anderson*, 148 Ill. 2d at 28, 591 N.E.2d at 467.

The conduct prohibited is couched in language which is as precise as possible, albeit lacking mathematical precision. (See *Grayned v. City of Rockford* (1972), 408 U.S. 104, 110, 33 L. Ed. 2d 222, 228-29, 92 S. Ct. 2294, 2300.) The intent to harass or annoy is lent further meaning by the use of the term "threat," by limiting the intentional harassing or annoying acts to situations in which a threat is inherent. (See *People v. Parkins* (1979), 77 Ill. 2d 253, 257-58, 396 N.E.2d 22, 24.) The focus of the intentional harassment and threats is limited to a clearly defined group of persons. The statute is not a prohibition of threats generally, uses terms which are in ordinary usage and which are readily comprehensible, and does not lend itself to the exploitation of ambiguity. As such, "[t]he statute's limited scope takes it out of the realm of social or political conflict where threats to engage in

behavior that may be unlawful may nevertheless be part of the marketplace of ideas, broadly conceived to embrace the rough competition that is so much a staple of political discourse." (*United States v. Velasquez* (7th Cir. 1985), 772 F.2d 1348, 1357.) Defendant's allegations of statutory vagueness are therefore unavailing.

Defendant next argues that the trial court erroneously allowed the introduction into evidence of the recording of transmissions made to the dispatcher's desk and an enhanced cassette recording of that recording. He conceded at the hearing on his motion to suppress the tapes that the recording was not made for any clandestine purpose. In his brief, he also concedes that the recording of his diatribe and the complainant's response to it was made inadvertently by the accidental pick-up of the defendant's loud remarks on the police department's reel-to-reel dispatcher desk tape, which records all incoming patrol unit messages and telephone calls. Defendant also explicitly admits in his brief that complainant was not secretly taping the conversation.

Defendant maintains that his right under the fourth amendment of the United States Constitution to freedom from unreasonable searches and seizures and his right to freedom from invasions of privacy and communications by eavesdropping devices under article I, section 6, of the Illinois Constitution were violated when the court allowed the jury to hear the tape in the State's case in chief and, upon its request, in the jury room during deliberations. He argues that the tape was "fruit of the poisonous tree" under the Eavesdropping Act (Ill. Rev. Stat. 1991, ch. 38, par. 14—1 *et seq.*) and as such was inadmissible. We believe that neither defendant's constitutional protections nor the statutory provisions were violated in this case.

A defendant's establishment of (1) a "primary illegality" and (2) a connection between that primary illegality and its alleged fruits is essential to warrant exclusion of evidence as fruit of the poisonous tree. (*People v. Mitchell* (1992), 152 Ill. 2d 274, 326, 604 N.E.2d 877, 903.) The fourth amendment protects people, not places. (*Katz v. United States* (1967), 389 U.S. 347, 352-53, 19 L. Ed. 2d 576, 582-83, 88 S. Ct. 507, 512.) The two-pronged test for determining when the fourth amendment is triggered and evidence gained in violation of it is illegal and inadmissible is set out in *People v. Smith* (1992), 152 Ill. 2d 229, 244-45, 604 N.E.2d 858, 864: first, a person must have exhibited an actual (subjective) expectation of privacy, and second, the expectation must be one society recognizes as reasonable.

■ We believe that evidence concerning the circumstances surrounding the inadvertently recorded conversation shows that defendant had no reasonable expectation of privacy in his conversation

which would make that recording a fourth amendment "search." A number of factors supports this determination. First, the conversation took place in the lobby of the Vandalia police station, a location which was of necessity a public one. This fact would be obvious to anyone, particularly a law enforcement officer. Although defendant might have preferred that no one witness his diatribe against the complainant, the public setting in which he chose to deliver it exposed him to the possibility that a member of the public or another law enforcement officer might enter the lobby at any moment. It has been held that there is no reasonable expectation of privacy in the common-hall area of an apartment building, common entrance, or pathway. (*Smith*, 152 Ill. 2d at 245-46, 604 N.E.2d at 864.) If one cannot reasonably expect privacy in the common areas of a privately owned apartment building and its environs, it is unreasonable to expect society to recognize a right to privacy in the lobby of a publicly owned municipal building and the immediately adjacent public sidewalk and street. Second, the area in which the conversation took place was not locked, nor was entry into the lobby predicated on being granted entrance via a buzzer system. (See *Smith*, 152 Ill. 2d at 246, 604 N.E.2d at 864, citing *Commonwealth v. Hall* (1975), 366 Mass. 790, 794, 323 N.E.2d 319, 322.) The ease of ingress afforded members of the public and law enforcement officers to the lobby of the police station militates against defendant having a reasonable subjective belief that any conversation held in the lobby would be a private one. Third, defendant's tirade was delivered at peak volume. The complainant testified that defendant was literally screaming at her, and defendant's own witness testified that he could hear the exchange from across the street when defendant was yelling at the complainant outside of the building. There is no privacy interest in a raised-voice conversation loud enough to be overheard from such a distance. (See *Smith*, 152 Ill. 2d at 246, 604 N.E.2d at 864 (no reasonable expectation of privacy in conversation loud enough to be heard by persons standing in hall outside apartment); *People v. Cole* (1989), 186 Ill. App. 3d 1002, 1007, 542 N.E.2d 1145, 1148 (privacy expectation negated where defendant shouted at police chief in station, knowing he was surrounded by police officers by whom statements could have been heard).) Defendant's actions failed to convey any impression that he had even a subjective expectation of privacy in his interaction with the complainant, and society surely does not deem a shouting match conducted in the lobby of a municipal building or on a public thoroughfare as even remotely "private," as the word is commonly used.

The factors which support our determination that defendant's

fourth amendment rights were not abrogated also lead us to conclude that his constitutional protection under article I, section 6, of our State constitution was not violated. See *Smith*, 152 Ill. 2d at 256, 604 N.E.2d at 864.

Our discussion of the defendant's lack of a reasonable expectation of privacy in regard to the constitutions of the United States and this State applies with equal force to his argument that the accidental recordation of his conversation with the complainant violated the Eavesdropping Act. The Eavesdropping Act was passed to protect the privacy of the individual (see Ill. Ann. Stat., ch. 38, par. 14—1, Committee Comments, at 606 (Smith-Hurd 1979)) from what was defined at common law to be eavesdropping, which is "to listen secretly to what is said in private." (*People v. Klingenberg* (1975), 34 Ill. App. 3d 705, 707-08, 339 N.E.2d 456, 458.) The *Klingenberg* court found: "Eavesdropping is not merely the listening to or recording of any oral communication. Such an over-inclusive definition was not, in our opinion, intended by the General Assembly." (*Klingenberg*, 34 Ill. App. 3d at 708, 339 N.E.2d at 459.) The primary factor in determining whether eavesdropping has been committed in violation of the Eavesdropping Act is not whether all parties to the recorded conversation consented to the recordation but whether the complaining conversants justifiably expected their conversation to be private. (*Cole*, 186 Ill. App. 3d at 1006, 542 N.E.2d at 1147.) Moreover, eavesdropping does not occur when the person recording the conversation is either a party to the conversation or known by the participants to the conversation to be present. (*People v. Beardsley* (1986), 115 Ill. 2d 47, 56, 503 N.E.2d 346, 351.) The complainant was employed by the police department to answer incoming calls to the department, and both she and the defendant were aware that the communications from the community and patrol units were recorded. Complainant was a party to the conversation in question. As such, she was competent to testify concerning the contents of the conversation. She could have taken notes or transcribed the conversation and testified concerning it. (*Thomas v. Pearl* (C.D. Ill. 1992), 793 F. Supp. 838, 845, *aff'd* (7th Cir. 1993), 998 F.2d 447, citing *Cole*, 186 Ill. App. 3d at 1006, 542 N.E.2d at 1147.) Because defendant had no expectation of privacy in his conversation which society would find reasonable and the complainant was competent to testify about his diatribe, the Eavesdropping Act is inapplicable to the instant case.

Defendant's last contention of error is that the trial court demonstrated bias in favor of the State (1) when it interrupted defense counsel with an inquiry about the relevance of a question posed on cross-examination but allowed counsel to continue after an in-

chambers consultation and (2) when it interrupted defense counsel's closing argument by advising the jury that its decision was not to be based on sympathy or prejudice. Defendant construes these acts as an "open display of hostility to [d]efense counsel and continued interruption of [d]efense counsel's presentation," as well as assuming "the role of prosecutor by objecting." We cannot agree with defendant's position.

■ The first interruption was prompted by counsel's attempt to draw out testimony concerning internal quarrels which allegedly undermined the functioning of the Vandalia police department. The court questioned the relevancy of the testimony sought in regard to the instant prosecution. Following an *in camera* discussion, defense counsel was allowed to explore the possibility that there was some bias on the part of the police department against the defendant. The second interruption by the court occurred after counsel spoke of how much defendant loved the trappings of his position, his patrol car, and his uniform. He went on to stress how important the jury's decision would be for the defendant and how his career was in the hands of the jurors. At this point, the court interrupted counsel, saying: "I'm going to advise the jury that sympathy or prejudice don't [*sic*] have any place in a court of law and that is not something you will consider. The defendant's career is not what's the issue here, the issue here is two offenses. Proceed on."

Even if we found the remarks of the trial court to be improper, reversal of a jury verdict would be warranted only if the conduct of the court played a material role in defendant's conviction or prejudiced him. (*People v. Jackson* (1993), 250 Ill. App. 3d 192, 204, 620 N.E.2d 1239, 1248, citing *People v. Enoch* (1989), 189 Ill. App. 3d 535, 543, 545 N.E.2d 429, 436.) The complained-of interruptions were not such that the court assumed the role of the prosecutor by questioning witnesses in a way which emphasized evidence which would support a guilty verdict (see *People v. Santucci* (1962), 24 Ill. 2d 93, 98, 180 N.E.2d 491, 493-94), nor did the court grill witnesses, react negatively to defense counsel's objections to the court's questioning, or intimate that a defense witness was perjuring herself by asking if she was conversant with the punishment for lying on the stand (see *People v. Moriarity* (1966), 33 Ill. 2d 606, 613, 213 N.E.2d 516, 520). The court is responsible for maintaining the flow of proceedings in an orderly manner and is given considerable latitude in how it accomplishes that task. (*People v. Schuld* (1988), 175 Ill. App. 3d 272, 282, 529 N.E.2d 800, 806.) The court's interjections were minimally intrusive, exhibited no bias against the defendant, did not affect the outcome the trial, and therefore did not constitute an abuse

of discretion which would warrant reversal of the verdict. See *Schuld*, 175 Ill. App. 3d at 282, 529 N.E.2d at 806.

The defendant's conviction and sentence are affirmed.

Affirmed.

CHAPMAN and WELCH, JJ., concur.