No. 2--06--0117

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CF--2254 |
| MICHAEL P. CARDAMONE, | ) ) | Honorable George J. Bakalis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CALLUM delivered the opinion of the court:

Following a bench trial, defendant, Michael P. Cardamone, was convicted of harassment of a witness (720 ILCS 5/32--4a(a) (West 2000)). The trial court denied defendant's motion for a new trial and sentenced him to three years' imprisonment. The court subsequently denied defendant's motion to reconsider his sentence. Defendant appeals, challenging the sufficiency of the evidence for his conviction. We affirm.

I. BACKGROUND

Defendant was charged by indictment with two counts of harassment of a witness and three counts of disorderly conduct (making a false police report) (720 ILCS 5/26--1(a)(4) (West 2000)). All counts arose from a single incident that was alleged to have occurred on July 7, 2004. As to the witness-harassment count upon which he was ultimately convicted, the State alleged that defendant, with the intent to harass or annoy Teresa Eason, a potential witness in a pending legal proceeding

against defendant, communicated indirectly with her in that he placed a 911 call and falsely reported that Eason committed or was committing traffic offenses. The call resulted in a police officer effecting a traffic stop in such a manner as to produce mental anguish and emotional distress for Eason.

At trial, Eason testified that her 10-year-old daughter, C.E., was named as a victim in a prosecution against defendant in Du Page County and that both Eason and her daughter were potential witnesses in that proceeding. Both later testified in the proceeding. Eason knew defendant because her daughter attended a gymnasium where defendant was the head gymnastics coach. According to Eason, on July 7, 2004, she attended a hearing at the Du Page County courthouse in the other proceeding. After the hearing, Eason left the courthouse ahead of defendant. She was alone. From the courthouse, Eason drove her Dodge minivan on Roosevelt Road to Winfield Road. She turned onto Butterfield Road from Winfield and then turned south onto Eola Road, west onto McCoy, and north onto Cheshire Town, the street where she lived.

At a stoplight on Butterfield at Route 59, Eason took down her visor to fix her lipstick. She saw in the mirror that defendant and his wife, Elizabeth, were in a vehicle immediately behind her. Eason recognized defendant's wife from the gymnasium. Defendant was driving, and his wife was in the front passenger seat. According to Eason, after the light at Butterfield and Route 59, defendant and his wife remained behind her. Eason continued to observe them. While Eason was driving on Eola Road, between Butterfield and North Aurora Roads, defendant drove up next to her in the right lane. Defendant and Elizabeth looked at Eason. They then dropped back and drove behind Eason's vehicle. While driving on Eola Road, defendant's vehicle was close to Eason's; no other vehicle could

come between them. At that point, Eason was "very conscious" that defendant and Elizabeth were following her; she was nervous.

After they passed North Aurora Road, Eason observed that defendant and Elizabeth were laughing. This made Eason uncomfortable.

Eason denied that she ever swerved her vehicle out of its lane while driving on Butterfield or Eola. She also denied jerking her vehicle while in her lane. Eason testified that she drove steadily and smoothly; she did not speed. As Eason approached McCoy, she changed lanes to get into the right lane to turn onto McCoy. She used her signal to indicate that she was about to change lanes. Eason denied that she cut off any vehicles when she changed lanes. Defendant's vehicle stayed in the left lane. When Eason turned right off of Eola, she passed a slow-moving car. Eason denied that she speeded or swerved while driving on McCoy. While driving on McCoy, as she approached Cheshire, police lights went on behind her. It was about 10:40 a.m. Eason pulled over on Cheshire. The police car was the slow-moving, unmarked vehicle she had passed.

The police officer approached Eason and told her that there had been a call that she was driving erratically and may have been drinking. Eason told the officer that she knew who had made that call: "The man who is charged with sexual[ly] abusing my daughter has been following me all the way home. And he is the only one that would have called the police." The officer asked Eason if she had anything to drink or a bottle. She told him she had none and invited him to search her vehicle. The officer looked inside the van.

Eason further testified that, during the stop, she was "extremely nervous and scared from the following home." She stated that her "heart drop[ped] like it always does when a police officer--even when you know you didn't do anything wrong, you think what did I do." Eason explained that it was

"nerve wracking. And then once I pulled over and he came up and told me why he was pulling me over, probably a little bit of anger, quite a bit of anger then that this was happening." Eason stated that she was "upset and scared and angry."

Eason further testified that the police officer treated her appropriately and courteously. He did not accuse Eason of doing anything wrong. He was "professional." The officer did not ask her to get out of her vehicle or to perform any sobriety tests. Eason denied that she had consumed alcohol within the previous 12 hours. The entire police encounter lasted about 5 to 10 minutes.

Michael Auld, the officer who stopped Eason on July 7, 2004, testified that at about 10:30 a.m. that day he received a general dispatch that someone had called to report a driver possibly under the influence on Eola Road. The caller had described a maroon minivan driving south on Eola from Butterfield. The caller had also given the license plate number and stated that the driver was female and that there possibly was open alcohol in the car. The license plate number Auld recorded from the dispatch matched the one he later observed.

Auld was traveling west on McCoy Drive, east of Eola, when he observed the minivan at a stoplight on southbound Eola, waiting to turn right onto McCoy. Auld slowed down and let the minivan pass him. He followed it for about half a mile and observed no erratic driving or traffic violations. As the van approached Chesire, Auld activated his police lights to pull it over. Auld testified that he approached the van and asked Eason for her license and proof of insurance. He did not ask Eason to perform any sobriety tests because he did not see any evidence of alcohol consumption or of being under the influence of alcohol. Eason opened the sliding door of the minivan for Auld, and Auld did not find any container inside. He did not perform a full search of her vehicle. Auld wore a uniform that day and drove in an unmarked police car.

Eason informed Auld that a car had been following her and had pulled up next to her at one point. Auld did not raise his voice to Eason and treated her in a professional manner.

Elizabeth testified for the defense that, on July 7, 2004, she, defendant, and their seven-month-old son drove to the courthouse in their sport utility vehicle (SUV), a GMC Envoy, for a hearing involving criminal charges that were pending against defendant. They lived in Aurora, about two miles south of the intersection of Eola and McCoy. For one year leading up to the incident with Eason, defendant and his wife drove the following route most of the time to the courthouse: Hafenrichter to Eola to Butterfield to Winfield to Roosevelt to County Farm Road. This is the direct route from their home to the courthouse. According to Elizabeth, prior to July 7, 2004, she had observed Eason in an automobile on only one occasion, about one year earlier.

After their court appearance on July 7, 2004, the Cardamones retrieved their SUV from the courthouse parking garage to go home. Defendant drove, and Elizabeth sat in the back seat with their son. Elizabeth sat in the middle. They drove west on Butterfield and turned south on Eola. They did not see Eason when they left the courthouse parking garage.

Elizabeth did not see any vehicles or people she knew at either the intersection of Butterfield and Route 59 or the intersection of Butterfield and Eola. Eola is four lanes wide. When they turned onto Eola from Butterfield, defendant drove into the right lane in order to pass a minivan in front of him. That vehicle then drove into the right lane, and defendant drove into the left lane to pass the van. The van then came back into the left lane and defendant again drove into the right lane. The van then drove back into the right lane. Elizabeth became "fearful" and told defendant to call 911 because she thought that she had observed the driver drinking, using his or her right hand to bring

something to his or her mouth. Elizabeth could not tell if the driver was a man or a woman because the minivan's windows were tinted.

Elizabeth further testified that she had not previously observed the vehicle in front of them. Defendant told the 911 operator that they were observing someone on the road and that they had observed the person drinking. He did not give his name. When defendant made the call, they were on Eola north of Interstate 88. After they drove over the interstate, at Diehl Road, defendant and Elizabeth decided to look inside the minivan. They drove up to it, and Elizabeth saw Eason driving the van. Defendant then slowed down so that he could see Eason. "Then I told Michael that I just wanted her away from us, to let her get ahead of us." Defendant slowed down and let other cars drive in between his vehicle and Eason's vehicle.

According to Elizabeth, other than the time they were side by side at Diehl Road, the Cardamones' vehicle and Eason's vehicle were never closer than four to six car lengths. Elizabeth did not observe any unusual maneuvers by Eason during or after the 911 call was made. Defendant gave the 911 operator Eason's license plate number. After identifying Eason, he did not call again to report her identity as the driver. Defendant had on five prior occasions called 911 to report traffic offenses.

Defendant testified that he drove home with his wife and son after attending the hearing on July 7, 2004. Prior to that day, he had never observed Eason in her vehicle. Soon after defendant turned onto Eola, he tried to pass Eason's vehicle in front of him. However, she kept changing lanes and cutting him off. When defendant turned onto Eola from Butterfield, he first turned into the left lane of Eola. He then changed lanes because he was cut off by the vehicle in front of him. After being cut off again, defendant drove into the left lane. He then drove back into the right lane after he was cut off. At all times, the minivan was about 1 to 1½ car lengths ahead of defendant's vehicle.

Elizabeth, who was in the backseat with their son, told defendant to call 911 because the van was making her nervous. When defendant called 911, he did not know the identity of the driver of the van; he could not see the driver's face. He assumed that the driver was a woman and saw a silhouette of something elongated in the person's right hand going up to the driver's face. After he made the 911 call, defendant stayed about 10 car lengths away from Eason's vehicle until Diehl Road, where he drove up next to it and saw that the driver was Eason. After he saw who the driver was, defendant stayed far away from her as he continued south on Eola.

Defendant denied that he made the 911 call to harass or annoy Eason. He believed that he was making a legitimate call to report someone who was committing a traffic offense. It appeared to defendant that the driver either was intoxicated or had improperly changed lanes.

On January 13, 2006, the trial court found defendant guilty on two counts of harassment of a witness. It found Eason's testimony more credible than that of defendant and his wife. According to the court, to find defendant's version more credible, the court would have had to believe that Eason saw defendant on Butterfield Road and wanted to harass him by cutting him off. When she could not do so on the single, westbound lane on Butterfield, she began to do so upon turning left, on the two southbound lanes of Eola Road. Her motivation to do this "is at best strained." The court further found that the Cardamones' testimony was somewhat contradictory. It noted that Elizabeth testified that defendant turned into the right lane on Eola and was then cut off by the minivan moving right, whereas defendant testified that he turned into the left lane on Eola and moved right to pass the van and was then cut off. Furthermore, Elizabeth testified that she saw the minivan driver use his or her right hand to bring an object to his or her mouth, whereas defendant testified that he could not see the driver when he moved into the left lane but also testified that he saw the driver bringing an

elongated object towards his or her mouth. The court also found defendant's 911 call suspect. The court noted that defendant told the 911 operator that the van was swerving all over the place, whereas he testified that he was repeatedly cut off by the driver. The court also found significant that defendant did not call 911 again after he identified Eason as the minivan driver.

Accordingly, the trial court found that the evidence was sufficient to establish that defendant determined Eason's identity at some point prior to making the 911 call and that he made a false report knowing there were no reasonable grounds for it. Addressing the harassment-of-a-witness counts, the court found that: (1) Eason was expected to be a witness or was a family member of a witness in a pending case or proceeding; (2) defendant communicated indirectly with Eason; (3) defendant specifically intended to harass or annoy Eason when he made a false report as to her driving and did so knowing that Eason was a family member of a witness; and (4) the communication caused Eason to suffer mental anguish or emotional distress, because she was apprehensive about being stopped by the police, angry and scared when she learned of the 911 call, and generally upset, anxious, and uncomfortable.

The court denied defendant's motion for a new trial. It sentenced defendant to three years' imprisonment followed by two years of mandatory supervised release, consecutive to the 20-year sentence he received in the other criminal case. A conviction was entered on the first count of harassment of a witness, and all of the other counts were merged into it. Defendant's motion to reconsider his sentence was denied. Defendant appeals.

## II. ANALYSIS

### A. Mental Anguish or Emotional Distress

Defendant argues first that the State failed to prove beyond a reasonable doubt that the traffic stop produced in Eason's mind the requisite mental anguish or emotional distress.

"When analyzing the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." People v. Howell, 358 Ill. App. 3d 512, 528 (2005). We review the construction of a statute de novo. People v. Montoya, 373 Ill. App. 3d 78, 81 (2007).

A person commits witness harassment if he or she:

"with intent to harass or annoy one who has served or is serving or who is a family member of a person who has served or is serving *** (2) as a witness, or who may be expected to serve as a witness in a pending legal proceeding, because of the testimony or potential testimony of the witness [or potential witness], communicates directly or indirectly with the *** witness [or potential witness or family member thereof] in such manner as to produce mental anguish or emotional distress or who conveys a threat of injury or damage to the property or person of any *** witness [or potential witness or family member thereof.]" (Emphasis added.) 720 ILCS 5/32--4a(a) (West 2002).

The statute contains two alternative bases of liability for witness harassment. A person is guilty of the offense if, having the requisite intent, he or she: (1) communicates with the witness, potential witness, or family member in such a manner as to produce mental anguish or emotional distress; or (2) conveys a threat of injury or damage to the person or property of the witness, potential witness, or family member. People v. Berg, 224 Ill. App. 3d 859, 863 (1991). "The first alternative appears

-9-

to be a subjective one, based on whether the communication in fact produced mental anguish or emotional distress in the mind of the victim." Berg, 224 Ill. App. 3d at 863-64.

The trial court found that Eason suffered mental anguish or emotional distress as a result of defendant's actions. It noted that Eason was apprehensive after being pulled over by Auld. The court also noted Eason's testimony that she was angry when she learned of defendant's 911 call and that she was upset and scared by what had occurred. The court also noted the subjective test, finding that Eason suffered "some" emotional distress as a result of defendant's conduct. It found that defendant's actions "would make a person upset[,] anxious[,] and certainly uncomfortable."

Defendant concedes that Eason was upset as a result of being pulled over by the police officer. However, he argues that mental anguish or emotional distress sufficient to support a conviction of witness harassment must be akin to that from a threat of injury or damage to the individual's person or property. According to defendant, the meanings of "mental anguish" and "emotional distress" are determined with reference to "threat of injury or damage to the person or property of [the] witness," i.e., the second basis for liability under the statute. 720 ILCS 5/32--4a(a) (West 2002).

Defendant relies on People v. Taylor, 349 Ill. App. 3d 839 (2004). In that case, the defendant was convicted of telephone harassment, which is defined as "[m]aking a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number." 720 ILCS 135/1--1(2) (West 2002). The defendant was charged with intending to harass the victim. This court noted that the meaning of the term "to harass" was previously interpreted by adopting the definition of harassment from the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 et seq. (West 2002)). We noted that the word "harassment" implies " 'intentional acts which cause someone to be worried, anxious, or uncomfortable.' " Taylor, 349 Ill. App. 3d at 842, quoting People v.

Zarebski, 186 Ill. App. 3d 285, 294 (1989). However, considerations of constitutionality and statutory interpretation require that emotional distress, anxiety, and discomfort necessarily have to refer to emotional disturbances more serious than the "mildest states" of these terms suggest. Taylor, 349 Ill. App. 3d at 842. Furthermore, we noted the supreme court's instruction in People v. Parkins, 77 Ill. 2d 253 (1979). There, the court addressed a first amendment challenge to the telephone-harassment statute by invoking the maxim noscitur a sociis--that one knows a word by the company it keeps--and holding that the words "abuse" and "harass" take color from the word "threaten" and acquire more restricted meanings. Parkins, 77 Ill. 2d at 257-58. Accordingly, we held that "harass" and "abuse," which do not necessarily imply disturbing actions, take some of that implication from the word "threaten." Taylor, 349 Ill. App. 3d at 843. "Thus, for a call to be made with intent to harass, the caller must have had the intent to produce emotional distress akin to that of a threat." Taylor, 349 Ill. App. 3d at 843. If a prohibition on a call made with the intent to harass is to pass constitutional muster, "the level of emotional distress or discomfort the caller intended to produce must be substantially greater than mere annoyance." Taylor, 349 Ill. App. 3d at 843-44.

Defendant also relies on People v. Calvert, 258 Ill. App. 3d 504 (1994). In that case, the defendant asserted that the witness-harassment statute is unconstitutionally vague because it provides insufficient guidance as to what conduct constitutes a violation. The Fifth District rejected the defendant's argument, noting that the conduct prohibited is addressed in language that is as precise as possible. Calvert, 258 Ill. App. 3d at 512. Also, the court stated that the "intent to harass or annoy is lent further meaning by the use of the term 'threat,' by limiting the intentional harassing or annoying acts to situations in which a threat is inherent." Calvert, 258 Ill. App. 3d at 512, citing Parkins, 77 Ill. 2d at 257-58.

Finally, defendant relies on People v. Nix, 131 Ill. App. 3d 973 (1985), wherein the Third District, addressing the witness-harassment statute, held that the State failed to prove that the defendant acted with the intent to harass or annoy. Nix, 131 Ill. App. 3d at 975. In Nix, the defendant was charged with harassing a narcotics agent who had testified against him in an earlier trial. The defendant approached the agent, Donna Kurlinkus, and another agent in a restaurant. The defendant followed Kurlinkus as she walked to the restroom. As Kurlinkus approached the hallway in front of the restroom, the defendant grabbed her arm and asked her, "How is it going?" Nix, 131 Ill. App. 3d at 974. Kurlinkus entered the restroom and locked the door. When she emerged a short time later, the defendant was still standing in the hallway. He again grabbed her arm and stated, "I want to talk to you." Nix, 131 Ill. App. 3d at 974. The other agent testified that, when Kurlinkus returned to their table, her eyes were wide and her voice was pitched higher than normal. The defendant denied that he followed or encountered Kurlinkus.

Reviewing the sufficiency of the evidence, the Third District held that the State failed to prove that the defendant acted with the requisite intent. The court concluded that the defendant's two statements to Kurlinkus, standing alone, did not evince an intent to harass or annoy. The court noted that Kurlinkus never called for help, leading to the inference that the defendant's communications were not threatening enough to cause her to seek aid. Given the innocuous nature of the defendant's statements, the fact that the encounter occurred by chance and in a public place, and that Kurlinkus did not call out for help, the court held that the evidence was insufficient to establish that the defendant possessed the intent to harass or annoy her. Nix, 131 Ill. App. 3d at 975.

Here, defendant asserts that, as in Nix, his encounter with Eason occurred by chance in a public place. Defendant and his wife were driving home from the same court hearing, on Eola Road,

which was a direct route home for both the Cardamones and Eason. Defendant further notes Eason's testimony that Auld was courteous and professional toward her, that he quickly determined that she was not intoxicated, and that he did not administer any sobriety tests. He also did not search the vehicle, although he looked inside. According to defendant, Eason was certainly upset upon being pulled over by a police officer. However, he argues that, when viewing the evidence in the light most favorable to the State, no rational trier of fact could infer that the traffic stop produced in Eason the sort of mental anguish or emotional distress contemplated by the statute as it has been interpreted to avoid constitutional offense. See Calvert, 258 Ill. App. 3d at 512. Defendant contends that the trial court did not find that defendant followed Eason home, although Eason testified that what scared her was her belief that defendant was following her home.

We conclude that defendant's reliance on the foregoing cases is misplaced. All of the cases address the intent element of the crimes at issue. Here, defendant challenges whether the State established that he produced mental anguish or emotional distress and not whether he had the intent to harass or annoy. Furthermore, we find the Calvert court's adoption of the reasoning in Parkins troubling. Parkins addressed a challenge to the telephone-harassment statute and held that the words "abuse" and "harass" take color from the word "threaten." Parkins, 77 Ill. 2d at 257-58. The Calvert court seized on this analysis to hold that interpretation of the intent element of the witness-harassment statute is aided by examination of the term "threat," which appears in the language setting forth the second basis for liability. This analysis is flawed because, as we noted above, the witness-harassment statute contains two alternative bases for liability: (1) communication that produces mental anguish or emotional distress; or (2) conveyance of a threat of injury or damage to the person or property of the witness, potential witness, or family member. Berg, 224 Ill. App. 3d at 863; see 720 ILCS 5/32--

4a(a) (West 2002). The Calvert court ignored the disjunctive "or" in the portion of the witness-harassment statute that sets forth the two alternative bases for liability when it analyzed the intent element therein. Accordingly, we do not find Calvert instructive and, to the extent that it sets forth an objective test or requires a higher level of mental anguish or emotional distress, we decline to follow it.

Also, we do not find Nix instructive. The defendant in Nix challenged the sufficiency of the evidence, asserting that the State failed to prove that he possessed the intent to harass or annoy. The Third District relied primarily on the innocuous nature of the defendant's statements to the victim in that case to reject the defendant's intent argument. In any event, the opinion does not mention the victim's reaction to the incident, other than noting that her fellow agent stated that the victim's eyes were wide and her voice was pitched higher than normal. We do not believe that this reaction constitutes mental anguish or emotional distress.

We find Berg instructive. In that case, the victim, a social worker, had testified about the defendant in a child-custody hearing. After the hearing, she left the courtroom with two coworkers. The defendant approached the three as they were waiting for an elevator outside the courtroom. From five feet away, he said "Susan, why did you lie in court?" Berg, 224 Ill. App. 3d at 860. The victim denied lying, but the defendant repeated the allegation. He then stepped closer to her and raised his voice. He said, "[Y]ou are going to be really sorry you said this" and "You are going to pay for what you said, and you are going to pay soon." Berg, 224 Ill. App. 3d at 860. As he was escorted out, the defendant said, "[S]omebody bigger than me is going to make you pay for this." Berg, 224 Ill. App. 3d at 861. Noting the subjective test, this court held that the evidence was sufficient to establish that the defendant's statements and conduct caused his victim mental anguish,

where the victim's initial reaction to the incident was surprise and amazement and where she later began to get scared. Berg, 224 Ill. App. 3d at 861, 865.

Mindful that the test for the mental anguish/emotional distress basis for liability under the statute is subjective, we conclude that the evidence here was sufficient to establish that Eason suffered mental anguish or emotional distress as a result of defendant's false report to the 911 operator. Eason testified that she was "extremely nervous and scared" upon encountering defendant and his wife on the route home and that the incident was "nerve wracking." She also noted that she was upset and "quite" angry when she found out why Auld effected the stop. Finally, we also note that defendant concedes that Eason was upset as a result of being pulled over by the police.

### B. Communication

Defendant argues next that the evidence was insufficient to establish that he communicated with Eason. See 720 ILCS 5/32--4a(a) (West 2002) ("communicates directly or indirectly with" witness, potential witness, or family member). According to defendant, there was no evidence from which it could reasonably be inferred that he communicated with Eason at all, directly or indirectly, or that he intended to do so. Therefore, he asserts that he was not proved guilty beyond a reasonable doubt of violating the statute.

Specifically, defendant contends that his 911 call should have resulted in nothing more than police scrutiny of Eason's driving. He notes Auld's testimony that he followed Eason's vehicle for half a mile and observed no erratic driving and no traffic violations. Thus, the call should not have resulted in a stop. Defendant also asserts that, because his call was anonymous, he did not intend to communicate anything by it to Eason.

Addressing the time when he drove up next to Eason, defendant argues that the trial court erred in finding Eason's testimony concerning this incident more credible than his and Elizabeth's testimony. He asserts that there was no evidence that he or Elizabeth made any gestures, mouthed any words, or held up their cell phone in an attempt to communicate with Eason. They simply glanced at her and drove on. As to Eason's testimony that she observed defendant and Elizabeth laughing, defendant argues that there was no evidence that he or Elizabeth was pointing at Eason or doing anything to indicate that their laughter was directed at her. Finally, defendant contends that, even if he committed an offense by telling the police that Eason appeared drunk, there was no evidence to show that defendant intended to thereby communicate with Eason.

Addressing the communication element, the trial court found that defendant communicated indirectly with Eason "through the use of police authority." It noted that, if defendant had pulled up beside Eason's vehicle and accused her without any reasonable basis of driving while intoxicated, threatened to report her to the police while knowing that she was a potential witness in his case, and did so to annoy or harass her, and if she suffered mental anguish or emotional distress as a result, defendant would be guilty of the offense. "To allow him to do basically the same action without speaking directly to her would be absurd."

The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. People v. Hickman, 163 Ill. 2d 250, 261 (1994). The language of a statute is the best means of determining legislative intent. Hickman, 163 Ill. 2d at 261. The statutory language should be given its plain and ordinary meaning. People v. Whitney, 188 Ill. 2d 91, 97 (1999).

The witness-harassment statute provides that the communication from a defendant to his or her victim may be direct or indirect. Thus, by its terms, the statute explicitly provides for all types

of communication. The term "communicate" is not defined in the statute. The common meaning is "to convey knowledge of or information about," "make known," or "to reveal by clear signs." Webster's Ninth New Collegiate Dictionary 266 (1988). The term "indirect" means "not straightforward and open" or "deceitful." Webster's Ninth New Collegiate Dictionary 614 (1988).

We conclude that defendant's actions fell within the foregoing definitions. Defendant indirectly--indeed, in a deceitful way--communicated with Eason by calling the police and effecting the stop. Eason was aware of the indirect communication from defendant. She testified that, upon being stopped by Auld, Eason told the officer that she knew that defendant had made the 911 call, a reference to her earlier testimony that she had observed defendant in her visor and that he had driven up next to her vehicle. As to Eason's testimony, we cannot conclude that the trial court erred in finding it more credible than defendant's or Elizabeth's testimony. It was not unreasonable for the trial court to credit Eason's testimony in light of the inconsistencies the court noted in the Cardamones' version of their encounter with Eason.

In summary, we conclude that the evidence was sufficient to establish that defendant communicated with Eason.

### III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

BOWMAN and GROMETER, JJ., concur.